

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-10-2004

# A.M. v. Luzerne Cty Juvenile

Precedential or Non-Precedential: Precedential

Docket No. 03-3075

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"A.M. v. Luzerne Cty Juvenile" (2004). *2004 Decisions.* Paper 558.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/558

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

_____

No. 03-3075

_____

A.M., by and through his next friend and
mother, J.M.K.,
Appellant

v.

LUZERNE COUNTY JUVENILE
DETENTION CENTER,
a department of Luzerne County,
Pennsylvania;
*SANDRA M. BRULO, individually
and in her official capacity
as chief administrator of the Luzerne
County Juvenile Detention Center;
LOUIS P. KWARCINSKI, individually
and in his official capacity
as deputy chief probation officer in
charge of the Luzerne County
Juvenile Detention Center;
JEROME PRAWDZIK, in his
individual capacity;
CHRISTOPHER TRAVER, in his
individual capacity;
CHRISTOPHER PARKER, in his
individual capacity;
MICHAEL CONSIDINE, in his
individual capacity;
MARK PUFFENBERGER, M.D.,
in his official capacity;
ELAINE YOZVIAK, R.N., in her
individual capacity

*(Amended per Clerk's Order dated
8/14/03)

Appeal from the United States
District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 01-cv-01276)
District Judge:
Honorable A. Richard Caputo

_____

Argued April 16, 2004

Before:  RENDELL, STAPLETON and
LAY*, <u>Circuit</u> <u>Judges</u>.

(Filed June 10, 2004)

_____

Marsha L. Levick
Lourdes M. Rosado     **[ARGUED]**
Juvenile Law Center of Philadelphia
1315 Walnut Street, 4th Floor
The Philadelphia Building
Philadelphia, PA  19107
  *Counsel for Appellant*

Sean P. McDonough     **[ARGUED]**
Dougherty, Leventhal & Price
75 Glenmaura National Blvd.
Moosic, PA  18507
  *Counsel for Appellees Luzerne
  County Juvenile Detention Center,
  Sandra Brulo, Louis P. Kwarcinski,
  Elaine Yoziak, Christopher Traver,
  Christopher Parker, Michael
Considine,  and Jerome Prawdzik*

_____

*Honorable Donald P. Lay, Senior Circuit
Judge for the Eighth Circuit, sitting by
designation.

James A. Doherty, Jr.    **[ARGUED]**
Scanlon, Howley, Scanlon & Doherty
321 Spruce Street
1000 Bank Towers
Scranton, PA 18503
  *Counsel for Appellee*
  *Mark Puffenberger, M.D.*

———————

OPINION OF THE COURT

———————

LAY, Circuit Judge.

A.M., by and through his next friend and mother, J.M.K., filed suit under 42 U.S.C. § 1983 and state tort law against the Luzerne County Juvenile Detention Center (the "Center") and several of its administrators and staff, alleging they violated his substantive due process rights by failing to protect him from harm while he was detained at the Center. The District Court granted summary judgment in favor of all Defendants and declined to exercise supplemental jurisdiction over the remaining state law claims. A.M. appeals. For the reasons that follow, the District Court's order granting summary judgment will be reversed in part and affirmed in part.

## I. BACKGROUND

On July 12, 1999, A.M. was arrested in Lake Township, Pennsylvania, for indecent conduct. He was taken to the Center, a secure detention facility for children alleged to be delinquent or adjudicated delinquent and awaiting final disposition and placement, and remained there until August 19, 1999.[1]

While at the Center, A.M. was physically assaulted by other juvenile residents[2] on numerous occasions. On July 26, 1999, A.M. reported that other residents had, among other things, spit on him, punched him in the arm, put his head in a garbage can, and thrown urine on his bed. An incident report completed by one of the Center's child-care workers, dated August 1, 1999, states that A.M. was hit on the back of the head with a ping-pong paddle thrown by another resident. Another incident report, dated August 2, 1999, relates that A.M. sustained a wound to his chest. The wound would not stop bleeding, and A.M. was taken to the hospital for treatment. Other incident reports were completed by the Center's child-care workers on an almost daily basis between August 2 and August 16, 1999. These reports reveal that other residents punched A.M. in the face, hit him, choked him, "whipped" him in the eye with a towel, and threatened him with physical harm. The assaults left A.M. with multiple bruises over his body, puncture wounds, black eyes, and swollen lips. The assaults

———————

[1]At the time of his detention, A.M. was thirteen years old, 4'11" tall, and about 92 pounds.

[2]The parties consistently refer to the youths detained at the Center as "residents." For ease of reference, we will use the same designation.

2

also caused A.M. to suffer humiliation, fear, and emotional distress.

Prior to his detention, A.M. had eleven prior psychiatric inpatient hospitalizations for behavior problems, was seeing a psychiatrist in the community, and had been taking medication to treat his Attention Deficit Hyperactivity Disorder ("ADHD"). A.M. suffered from several other mental and behavioral disabilities, including anxiety disorder, depressive disorder, atypical bipolar disorder, and intermittent explosive disorder. The Center's administrators and supervisors were made aware of these facts upon A.M.'s admission to the Center or shortly thereafter. A.M.'s mental and behavioral problems were reflected in his behavior at the Center, which included teasing and provoking other residents. After A.M.'s admission to the Center, he initially did not receive any medication for his ADHD because the Center could not obtain the necessary authorization to refill his prescription.

On July 23, 1999, a psychiatric evaluation was performed on A.M. by Dr. Paul Gitlin for the purpose of assessing A.M.'s current mental health treatment needs. During the evaluation, A.M. complained to Dr. Gitlin about the treatment he was subjected to by other residents, and Dr. Gitlin observed that A.M. had a bruise on his arm. Dr. Gitlin noted that A.M. had a long history of mental health and behavioral problems and that A.M. was having difficulty at the Center because of his untreated ADHD.

Dr. Gitlin's diagnosis of A.M. included a Global Assessment Functioning scale of 20-30 out of a possible 100, indicating behavior that is "considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000). Dr. Gitlin stated that it was medically necessary for A.M. to have a highly planned day, 7 days a week, 365 days a year, and for A.M. to receive medication on a continual basis in order to reduce his impulsiveness and motor restlessness. Dr. Gitlin entered an order for A.M. to receive the medication dexedrine, and A.M. began receiving the medication on July 24, 1999. After Dr. Gitlin's evaluation of A.M., and during the remainder of his detention, no mental health professional was called in to see A.M. or consult with the Center's staff about A.M.'s behavior, despite the ongoing difficulty child-care workers were having with him.

During A.M.'s detention, the Center's administrators directed that A.M. should be placed on the girls' side of the Center for a majority of the day. However, child-care workers periodically failed to abide by this directive, which resulted in A.M. being placed with boys who had previously assaulted him. On one occasion, A.M. was sent from the girls' side to the boys' side because he was "getting on the nerves" of a child-care worker on the girls' side.

3

On August 19, 1999, A.M. appeared in the Luzerne County Court of Common Pleas, Juvenile Division, for a disposition hearing. At the conclusion of the hearing, the court committed A.M. to Northwestern Intermediate Treatment Facility ("Northwestern") in Northumberland County, Pennsylvania, for an indeterminate period of time.

On the day of his admission to Northwestern, John DeAngelo, a counselor at Northwestern, saw that A.M. was bleeding from a puncture wound on his chest. When DeAngelo asked A.M. about the wound, A.M. told him that he had been stabbed with an unknown object while at the Center. A.M. went on to describe to DeAngelo other physical assaults visited upon him by residents of the Center. DeAngelo proceeded to complete an incident report concerning the alleged physical assaults. DeAngelo reported that A.M. told him staff at the Center knew about the assaults but did not do anything to stop them. In addition to the incident report, DeAngelo completed a Report of Suspected Child Abuse, dated August 26, 1999, in which he recounted A.M.'s allegations of abuse while at the Center and inaction by the Center's staff. The Report states that A.M. feared this type of abuse would continue at each of his future placements. DeAngelo and another member of the Northwestern staff observed that A.M.'s eyes were black and blue when he arrived at Northwestern and that A.M. appeared to be very scared. Northwestern staff indicated that A.M. expressed fear that he would be hurt by other children at Northwestern.

In July of 2001, A.M., by and through his next friend and mother, commenced a § 1983 and state tort action against the Center and the following administrators and staff: Sandra Brulo, the Center's chief juvenile probation officer, who acted as the Center's chief administrator; Louis Kwarcinski, the Center's deputy chief of juvenile probation; Jerome Prawdzik, the detention supervisor at the Center; Chris Traver, Michael Considine, and Chris Parker, former child-care workers at the Center; Elaine Yozviak, a former registered nurse at the Center; and Mark Puffenberger, M.D., a physician who provided contract services to the Center. The suit alleged that the Defendants violated A.M.'s substantive due process rights under the Fourteenth Amendment to be free from harm and to receive appropriate medical treatment while in their custody.

## II. DISTRICT COURT OPINION

After discovery, the Defendants moved for summary judgment. The District Court granted the Defendants' motion on June 30, 2003. In its Memorandum accompanying the order granting summary judgment, the District Court addressed each of A.M.'s claims against the Defendants.

*Count One.* Count One of A.M.'s complaint alleged that the Center and Brulo and Kwarcinski, in their official

capacities, were liable for failing to protect A.M. from harm and failing to treat him, and that Dr. Puffenberger was liable in his official capacity for failing to treat A.M.

A.M. alleged several deficiencies on the part of the Center, Brulo, and Kwarcinski as the basis for liability on Count One. The first allegation concerned deficient hiring and staffing practices. The District Court granted summary judgment in favor of Brulo and Kwarcinski on this allegation, after concluding that A.M. failed to show a direct causal link between A.M.'s injuries and the alleged hiring of employees without the requisite educational degree or the alleged understaffing of the Center. The second allegation concerned inadequate training of the Center's staff. The District Court granted summary judgment on this allegation because A.M. failed to present evidence from which deliberate indifference could be inferred. The third allegation concerned the lack of a written policy or protocol to ensure youth safety. The District Court granted summary judgment to Brulo and Kwarcinski on this allegation because there was no direct causal link between the lack of a policy and A.M.'s alleged injuries. The final allegation concerned the lack of policies and procedures to address the mental and physical health needs of residents. On this allegation, the District Court held that there was no evidence to suggest that the Defendants' actions were deliberately indifferent.

The District Court granted summary judgment in favor of Dr. Puffenberger on A.M.'s claims that Dr. Puffenberger failed to develop adequate medical policies for the Center. The District Court assumed, for purposes of summary judgment, that Dr. Puffenberger was responsible for developing such policies. However, the District Court held that summary judgment was appropriate because there was no direct causal connection between A.M.'s injuries and the allegedly deficient medical policies.

*Count Two.* Count Two alleged that Brulo, Kwarcinski, and Prawdzik were liable in their individual capacities for failing to protect A.M. from harm and failing to treat him. The claims against Brulo, Kwarcinski, and Prawdzik in Count Two were based on their failure to develop policies and their failure to adequately supervise the Center's child-care workers. Because the District Court found that no child-care workers under the supervision of these Defendants violated A.M.'s constitutional rights, it granted summary judgment in favor of Brulo, Kwarcinski, and Prawdzik in their individual capacities.

*Count Three.* Count Three alleged that Prawdzik, Traver, Parker, and Considine were liable, in their individual capacities, for failing to protect A.M. from harm. A.M.'s claims against Prawdzik, Considine, Traver, and Parker were based on allegations that the child-care staff failed to intervene soon enough when violence between A.M. and other residents

began to develop and failed to take A.M. for medical care.

Regarding A.M.'s claims that the child-care staff did not intervene soon enough, the District Court compared the situation to a prison disturbance and considered whether the staff acted "maliciously and sadistically to cause harm." See Fuentes v. Wagner, 206 F.3d 335, 345 (3d Cir. 2000). In the District Court's view, there was no evidence that the staff acted maliciously or sadistically. With regard to the alleged failure of the staff to take A.M. to the nurse on certain occasions, the District Court held that the evidence did not support a conclusion that this was done with deliberate indifference to a serious medical need of A.M., since he sustained mostly bruises from the altercations.

*Count Four*. Count Four alleged that Dr. Puffenberger and Yozviak were liable in their individual capacities for failing to treat A.M. The District Court granted summary judgment in favor of Dr. Puffenberger and Yozviak, concluding that any omissions by Yozviak did not amount to a wanton infliction of pain and the evidence against Dr. Puffenberger suggested, at most, negligence.

III. DISCUSSION

A. Standard of Review

We review the District Court's grant of summary judgment *de novo*, viewing "the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). Summary judgment is appropriately granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). However, summary judgment should not be granted where there is a "genuine" dispute about a material fact, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

B. Substantive Due Process

In order to maintain a § 1983 claim, "a plaintiff must show that the defendant deprived him of a right or privilege secured by the Constitution or laws of the United States while acting under color of state law." Williams v. Borough of West Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989). Analysis of a § 1983 claim begins by identifying the "exact contours of the underlying right said to have been violated" and then determining "whether the plaintiff has alleged a deprivation of a constitutional right at all." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000); County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998).

There appears to be no dispute between the parties that A.M. has a liberty interest in his personal security and well-

6

being, which is protected by the Fourteenth Amendment. See Youngberg v. Romeo, 457 U.S. 307, 315-19 (1982). The question thus becomes whether A.M. has adduced sufficient facts from which a reasonable jury could conclude that the Defendants' conduct constituted a violation of his constitutional rights. To answer this question, we must "determine what level of conduct is egregious enough to amount to a constitutional violation and . . . whether there is sufficient evidence that [the Defendants'] conduct rose to that level." Nicini, 212 F.3d at 809.

When executive action is at issue, a violation of the Fourteenth Amendment right to substantive due process may be shown by conduct that "shocks the conscience." Lewis, 523 U.S. at 846-47. Negligent conduct is never egregious enough to shock the conscience, but conduct intended to injure most likely will rise to the level of conscience-shocking. See id. at 849. In between these two extremes is a middle range of conduct known as deliberate indifference, which may rise to the level of conscience-shocking in certain circumstances. Id. at 849-50. The question of whether conduct amounting to deliberate indifference is sufficient to "shock the conscience" requires an "exact analysis of [the] circumstances" in a given case. Id. at 850.

The deliberate indifference standard "is sensibly employed only when actual deliberation is practical." Id. at 851. As in a prison setting, we believe the custodial setting of a juvenile detention center presents a situation where "forethought about [a resident's] welfare is not only feasible but obligatory." Id. We therefore conclude that this case is properly analyzed using the deliberate indifference standard. The circumstances of this case present a situation where the persons responsible for A.M. during his detention at the Center had time to deliberate concerning his welfare. See Leamer v. Fauver, 288 F.3d 532, 547 (3d Cir. 2002). We now turn to the claims against each of the Defendants.

1. Claims Against Yozviak and Dr. Puffenberger

As to the claims in Count One and Count Four against Dr. Puffenberger and Yozviak, we sustain the District Court's grant of summary judgment in their favor. We find no error in the District Court's grant of summary judgment in favor of Yozviak on A.M.'s claim that she is liable for failing to treat him. Like the District Court, we find no evidence in the record to support A.M.'s claims that Yozviak acted with deliberate indifference in her alleged failure to disseminate information to the Center's staff about A.M.'s mental health history or take other steps in response to the information.

Likewise, we find no error in the District Court's grant of summary judgment in favor of Dr. Puffenberger. The evidence reveals that Dr. Puffenberger is a general physician who was under contract with the Center to perform a medical evaluation of each resident,

7

including a physical examination, within forty-eight hours of admission. Dr. Puffenberger saw A.M. on only one occasion when he conducted the physical examination, and the record does not include any evidence that Dr. Puffenberger was asked, or required, to conduct a psychiatric evaluation of A.M. Even if we assume for the purposes of summary judgment that Dr. Puffenberger had some responsibility for formulating policies for the Center, our review of the record leads us to the conclusion that A.M. failed to present sufficient facts that any failure of Dr. Puffenberger with respect to his duties rose to the level of deliberate indifference.

### 2. Claims Against the Center and Brulo and Kwarcinski in Their Official Capacities

A.M. asserts claims against Brulo and Kwarcinski in their official capacities, based on their status as policymakers for the Center, and the Center itself. A suit against a governmental official in his or her official capacity is treated as a suit against the governmental entity itself. See Hafer v. Melo, 502 U.S. 21, 25 (1991). A governmental entity, like the Center, cannot be liable under a theory of respondeat superior or vicarious liability. See Monell v. New York Dep't of Social Servs., 436 U.S. 658, 691-92 (1978). Rather, in order for a governmental entity (generically referred to as a "municipality") to be liable for the violation of a constitutional right under § 1983, the plaintiff must identify a policy or custom of the entity that caused the constitutional violation. Bd. of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 403 (1997). A plaintiff can establish causation by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Id. at 407.

A.M. has identified the following policies or customs of the Center as providing a basis for liability: (1) deficient hiring and staffing policies and practices; (2) lack of an adequate training program for the Center's child-care workers in critical areas such as de-escalating conflicts between youths and managing youth behavior generally; (3) lack of established protocols to ensure youth safety, including the management of problematic youth behavior, de-escalation of conflicts, and identification and protection of children at risk of victimization; and (4) lack of established policies to address the mental and physical health needs of youth residents.

The District Court did not focus on whether A.M. had produced evidence of the existence of the alleged policies or customs. Instead, the District Court directed its analysis to whether there was a direct causal link between the alleged policies or customs and the harms suffered by A.M. See Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996) (stating a § 1983 plaintiff must "establish that the government policy or custom was the proximate cause of the injuries sustained"). In the District Court's view,

8

evidence of a causal connection was lacking. Our review of the record leads us to hold there exist sufficient facts to prevent the grant of summary judgment such that a jury should make the ultimate determination as to the violation of the alleged policies or customs, as we discuss more fully below. Once evidentiary proof is adduced, the issue of proximate cause is best left to the determination of a trier of fact. See id.

*Deficient Hiring and Staffing*

A.M. presented evidence that a number of the Center's child-care workers did not meet state standards for educational training. Under state law, the Center's child-care workers had to possess, at a minimum, either an Associate Degree in one of the social sciences or exceptional ability in lieu of the academic credentials. 55 Pa. Code § 3760.55(b). Employment applications produced for certain child-care workers reveal that these workers did not possess the requisite educational degree and there is no evidence that they had the credentials that would render them otherwise qualified for the job.

More significantly, A.M. presented evidence from which it may be inferred that the Center failed to ensure that there were enough child-care workers on duty to appropriately supervise youth at all times. Although Brulo testified in her deposition that the Center complied with staffing ratios, other evidence suggests that the number of child-care workers supervising the residents was inadequate. Christopher Traver testified that he had to supervise as many as ten residents at one time, and he submitted a resignation letter in which he complained that only one child-care worker would be left with the residents while he would be directed to complete tasks unrelated to supervising the residents, such as cleaning and other janitorial-type duties.

There is also evidence in the record that the Center was having problems with the supervision of residents by child-care workers at or around the time A.M. was a resident. For example, there are letters of reprimand from the Center's administrators to individual child-care workers, rebuking those workers for failing to adequately supervise the residents and failing to follow certain security measures.

The above evidence is at least sufficient to create a fact issue as to whether the Center had a policy or custom of deficient hiring and staffing. In addition to this evidence, A.M. submitted the unrebutted testimony of a corrections expert, Paul DeMuro, who opined that the problems with inadequate supervision of residents directly contributed to the abusive treatment A.M. endured at the Center. The District Court did not discuss this evidence, but we believe the evidence provides a causal link between the hiring and staffing policies and A.M.'s injuries. As long as the causal link between the alleged policy or custom and the constitutional injury is "not too tenuous,

9

the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990). Based on this standard, we conclude the evidence of the causal connection between these policies and A.M.'s injuries presented a jury question.

*Inadequate Training*

Analysis of substantive due process claims requires full consideration of all the circumstances of a given case. See Lewis, 523 U.S. at 850. Therefore, the evidence of deficient hiring and staffing policies must be considered in context with the evidence A.M. submitted concerning the lack of an adequate training program for the Center's child-care workers. A.M. contends the Center failed to train its child-care workers with respect to de-escalating conflicts between youth, managing youth behavior generally, dealing with sex offenders, and identifying and protecting youth in the population who would be easily victimized.

A municipality may be liable for failing to train its employees if that failure amounts to deliberate indifference. See City of Canton v. Harris, 489 U.S. 378, 389-90 (1989) (explaining that failure to train may amount to a policy or custom that is actionable under § 1983 when "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the

violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."). The deficiency of a municipality's training program must be closely related to the plaintiff's ultimate injuries. Id. at 391.

The record discloses the following with respect to the training of the Center's child-care workers. Child-care workers received a three-day orientation after they were hired, which essentially involved on-the-job training with respect to such issues as the Center's physical plant and fire safety. Brulo testified that the orientation included training on dealing with behavioral issues, but she did not identify any specific training in this area. Brulo also spoke generally about training in the areas of mental health and dealing with children, but she failed to describe with any specificity the training program for child-care workers.

Kwarcinski testified that the entire staff of the Center received training on dealing with physical threats to their own safety and threats from bombs or weapons. Although Kwarcinski testified that staff received training on defensive tactics in dealing with conflicts between residents, he stated that there was no training on how to de-escalate conflicts between youths or identify children that could be easily victimized by other residents in the Center. Other testimony indicates that child-care workers received training in CPR and first aid but did not receive training in de-escalating youth conflicts or identifying

10

and protecting youths that could be easily victimized.

Against this evidence, A.M. presented the unrebutted testimony of his corrections expert, DeMuro. DeMuro opined that the Center did not have an adequate training program for its staff and did not meet nationally recognized standards for training, which included having forty hours of pre-service training. In DeMuro's opinion, the Center's failure to train its staff and follow other recognized standards for the operation of juvenile detention facilities directly contributed to the inappropriate treatment of A.M. while he was detained.

The Center suggests that the numerous incident reports filed by child-care workers demonstrate that A.M.'s failure-to-train claim cannot be sustained. However, we fail to see the logic in this argument. Rather than support the Center's position, we see how a jury could view the incident reports as additional evidence of the lack of training for the child-care workers. Several of the incident reports indicate that child-care workers watched conflicts between A.M. and other residents escalate without intervening, resulting in physical injury to A.M. Viewing the incident reports in the light most favorable to A.M., they demonstrate the need for more or different training of child-care workers to deal with residents like A.M., who have significant behavioral and mental health problems. The incident reports also support an inference that recurrent harm to A.M. at the hands of other residents was predictable. See Bryan

County, 520 U.S. at 409-10 ("[A] high degree of predictability may also support an inference of causation -- that the municipality's indifference led directly to the very consequence that was so predictable.").

In our view, the evidence supports an inference that the potential for conflict between residents of the Center was high. Taken as a whole, we believe the evidence concerning the Center's failure to train its child-care workers in areas that would reduce the risk of a resident being deprived of his constitutional right to security and well-being was sufficient to prevent the grant of summary judgment. In other words, we cannot hold that the Center "was not deliberately indifferent to the risk as a matter of law." Berg v. County of Allegheny, 219 F.3d 261, 277 (3d Cir. 2000). Viewing the record in the light most favorable to A.M., we conclude the evidence concerning the Center's training program presents a genuine issue of material fact as to the sufficiency of that program and whether the inadequacies in the program bear a causal relationship to A.M.'s injuries.

*Lack of Policies to Ensure Youth Safety*

On appeal, A.M. argues he presented sufficient evidence from which a reasonable jury could infer that the Center's lack of established policies and procedures to ensure youth safety may have caused his injuries "at least in part." Bielevicz, 915 F.2d at 851. In this regard, A.M. focuses primarily on the Center's

11

lack of a written policy or procedure for reviewing and following up on incident reports.

There is contradictory testimony in the record regarding who was responsible for reviewing incident reports and deciding what course of action should be taken in response. Brulo and Kwarcinski believed Jerome Prawdzik was responsible for reviewing all incident reports in the first instance, investigating them, and giving feedback to the child-care workers. However, Prawdzik testified that incident reports would first go to Kwarcinski, who would decide which reports should go to Prawdzik. Prawdzik indicated that either Brulo or Kwarcinski had responsibility for deciding what course of action should be taken in response to the incident reports.

DeMuro testified that the Center had diffuse accountability and poor communication in key areas such as reviewing and following up on incident reports. In his opinion, deficiencies like these illustrated that the Center had seriously flawed policies and procedures that contributed to A.M.'s injuries and abusive treatment. In addition to relying on this testimony, A.M. asserts that a written policy clarifying the roles and responsibilities of the Center's administrators and staff with respect to the incident reports would have at least minimized the chance that A.M. would be inappropriately placed with youth who had previously assaulted him.

Although this issue presents a close question on whether the Center's failure to establish a written policy and procedure for reviewing and following up on incident reports amounts to deliberate indifference, we conclude that a reasonable jury could conclude from the evidence that by failing to establish such a policy the Center disregarded an obvious consequence of its action, namely, that residents of the Center could be at risk if information gleaned from the incident reports was not reviewed and acted upon. Similarly, a reasonable jury could infer that the failure to establish the policy was causally related to the constitutional violations of which A.M. complains. See Natale v. Camden County Corr. Facility, 318 F.3d 575, 585 (3d Cir. 2003) (holding that a reasonable jury could conclude that a governmental entity's failure to establish a policy to address the immediate medication needs of inmates was deliberately indifferent).

*Lack of Policies Regarding Residents' Physical and Mental Health Needs*

The District Court granted summary judgment in favor of the Center, Brulo, and Kwarcinski on A.M.'s claim that the lack of policies or procedures to address the physical and mental health needs of residents led to a violation of his constitutional rights. The District Court concluded that there was insufficient evidence that the Center was deliberately indifferent to A.M.'s medical needs, and insufficient evidence that any policy or custom of not providing mental health care worsened A.M.'s condition or otherwise caused him constitutional injury.

12

We first address the District Court's conclusion that A.M. presented insufficient evidence to suggest that the Center was deliberately indifferent to his serious medical needs. In this regard, the District Court applied the deliberate indifference standard for Eighth Amendment claims brought by prisoners against prison officials for failure-to-treat. A.M. takes issue with the application of this standard, noting that he was not a convicted prisoner but merely a juvenile detainee. Given his status as a detainee, A.M. maintains his claims must be assessed under the Fourteenth Amendment.

We do not dispute that A.M.'s claims are appropriately analyzed under the Fourteenth Amendment since he was a detainee and not a convicted prisoner. However, the contours of a state's due process obligations to detainees with respect to medical care have not been defined by the Supreme Court. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). Yet, it is clear that detainees are entitled to no less protection than a convicted prisoner is entitled to under the Eighth Amendment. See id.; see also Fuentes, 206 F.3d at 344. In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court held that a prisoner may state a cause of action under § 1983 upon showing that a prison official was deliberately indifferent to his serious illness or injury. Id. at 104-05. It is under this standard that we assess whether A.M. has presented sufficient evidence to show

that the Center was deliberately indifferent to his serious mental health needs.

A.M. presented evidence that the Center's administrators were aware, upon his admission, that he had serious mental health and behavioral problems, which required medication and psychiatric care. There is conflicting evidence in the record regarding whether the Center ever contacted A.M.'s treating psychiatrist to discuss his medication and treatment needs. A.M. also presented evidence that after Dr. Gitlin's evaluation of him on July 23, 1999, no other mental health professionals were consulted or asked to treat A.M., despite the ongoing difficulties the Center was having in managing his behavior. Rather than attending to the underlying mental health issues contributing to the difficulties in managing A.M., the Center viewed him as merely a behavior problem.

A.M. presented the unrebutted testimony of his psychiatric expert, Dr. Annie Steinberg, who stated that the Center did not provide appropriate treatment for A.M.'s pre-existing mental health condition while he was a resident. According to Dr. Steinberg, the Center did not "monitor, or recognize the exacerbation of [A.M.'s] psychiatric symptoms, warning signs and the need for modifications to the intervention, or demonstrate the fundamental principles relevant to the care of juveniles." (J.A. at 108a.)

We conclude the evidence A.M.

presented was sufficient to survive summary judgment on whether the Center was deliberately indifferent to A.M.'s mental health needs. A reasonable jury could conclude from the evidence that the Center knew about A.M.'s significant mental health issues but was unprepared to take the steps necessary to address those issues. We believe a genuine issue of material fact exists as to whether the Center's failure to establish policies to address the mental health needs of residents like A.M. amounted to deliberate indifference.

We next turn to A.M.'s argument that he presented ample evidence that the Center's lack of policies to address the physical and mental health needs of residents caused him harm. A.M. presented the unrebutted testimony of DeMuro that the Center had a seriously flawed intake and assessment system, which failed to provide for the sharing and dissemination of critical information about his mental health history. DeMuro opined that poor staff communication, particularly concerning the medical and mental health needs of residents, contributed to A.M.'s ongoing abuse by other residents. In addition to DeMuro's testimony, A.M. presented evidence that the Center never contacted his treating psychiatrist after his admission and had no protocols to address when a resident's treating psychiatrist was to be contacted, what follow-up was to be done once a resident received a mental health evaluation, and who was responsible for communicating information about a resident's mental health concerns to the staff. There were also the specific recommendations made by Dr. Gitlin for managing A.M.'s mental health problems and behavior, which do not appear to have been read by the Center's administrators, shared with the child-care workers, or incorporated into a plan for A.M.'s safety or treatment. Finally, Dr. Steinberg opined that the Center's failure to provide appropriate treatment for A.M.'s pre-existing mental health illnesses and protect A.M. from harm worsened A.M.'s mental health condition. A.M. argues this testimony demonstrates that the combination of his mental health conditions and the circumstances surrounding his detention created the direct harm that led to his injuries.

We believe the evidence A.M. adduced on the issue of whether the lack of policies to address the mental and physical health needs of residents caused his injuries is "not too tenuous." Bielevicz, 915 F.2d at 851. We therefore conclude that the issue of causation should have been left to a jury. Id.

In summary, based on the foregoing reasons, we hold that the District Court erred in granting summary judgment in favor of the Center and Brulo and Kwarcinski in their official capacities.[3]

---

[3]As stated earlier, the parties do not appear to dispute that A.M. has a protected liberty interest in his personal security and well-being. Implicit in this opinion is the

14

### 3. Claims Against Brulo, Kwarcinski, and Prawdzik in Their Individual Capacities

A.M.'s claims against Brulo, Kwarcinski, and Prawdzik in their individual capacities allege that they are liable for developing inadequate policies and customs and failing to adequately supervise their subordinates. The District Court disposed of the claims against these Defendants, concluding there was no evidence to suggest that any person under their supervision violated A.M.'s constitutional rights. Because A.M.'s claims implicate these Defendants in their roles as supervisors, we address the claims in terms of supervisory liability.

There are two theories of supervisory liability that are applicable to this case. The first involves Brulo and Kwarcinski in their roles as policymakers for the Center. Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989). Evidence in the record shows that Brulo and Kwarcinski had responsibility for developing policies and procedures for the Center. Given our conclusion that A.M. presented sufficient evidence to present a jury question on whether the Center's policies and procedures caused his injuries, we conclude summary judgment in favor of Brulo and Kwarcinski in their individual capacities was inappropriate.

The second theory of liability provides that a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations. See Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995). Again, given our conclusion, as discussed below, that A.M. presented sufficient evidence to prevent the grant of summary judgment on whether the child-care workers were deliberately indifferent to A.M.'s constitutional rights, we believe summary judgment in favor of their supervisors was inappropriate. The incident reports prepared by the child-care workers provided notice to their

view that, given this protected interest, a state-run juvenile detention center at least has a duty to protect detainees from harm (whether self-inflicted or inflicted by others) and provide, or arrange for, treatment of mental and physical illnesses, injuries, and disabilities. A juvenile detention center is comparable to a prison, which, in general, does not have as its primary aim the treatment of mental or physical illnesses, injuries, or disabilities, but nonetheless has a duty to care for and protect its inmates. On remand, the district court should more precisely define the duties the Center owes to its residents and consider the scope of those duties.

15

supervisors that A.M. was being assaulted by other residents and had severe behavior problems. While there is some evidence that Brulo, Kwarcinski, and Prawdzik took some disciplinary action with respect to certain child-care workers, A.M.'s evidence that they took little or no action to protect him is sufficient to present a genuine issue of material fact as to their knowledge of and acquiescence in the conduct of the child-care workers.

Based on the foregoing, we hold that the District Court erred in granting summary judgment in favor of Brulo, Kwarcinski, and Prawdzik in their individual capacities.

### 4. Claims Against Prawdzik, Considine, Traver, and Parker

The District Court granted summary judgment in favor of these former child-care workers and their immediate supervisor on A.M.'s claim that they repeatedly failed to protect him from harm. On appeal, A.M. argues the District Court applied the incorrect standard for assessing their liability. As noted above, the District Court relied on the standard for assessing claims of excessive use of force by prison officials in the prison disturbance context. See Fuentes, 206 F.3d at 345 (holding that excessive force claims in the context of a prison disturbance require a subjective inquiry into whether the force was applied in a good-faith effort to restore or maintain discipline, or maliciously and sadistically to cause harm).

A.M. contends the Fuentes standard is inapplicable in this case because it applies to the use of force by prison officials in a single instance of prisoner unrest where there is a need to act quickly. In contrast to a single instance of prisoner unrest, A.M. points out that he was assaulted by other residents on numerous occasions over a five-week period of detention, many times in the presence of child-care workers. A.M. argues that it is inappropriate to apply the deferential malicious and sadistic standard in a case such as his where there were almost daily physical altercations between A.M. and other residents. A.M. urges that his case is more appropriately judged by the deliberate indifference standard. We agree.

This case does not appear to us as one in which the child-care workers were required to make split-second decisions to maintain or restore order through the use of excessive physical force. Cf. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992) (holding that the core judicial inquiry in cases where prison officials are accused of using excessive force in the prison disturbance context is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"). Instead, the evidence in this case presents a situation in which child-care workers and their immediate supervisor had the opportunity over a five-week period to see a pattern of physical assaults against A.M. emerging, consult amongst each other concerning the appropriate response to this pattern, and

16

develop a plan to protect A.M. from assaults by other residents.

Other courts have applied the deliberate indifference standard in cases where prison officials failed to protect an inmate from attack by another inmate. See, e.g., Jeffers v. Gomez, 267 F.3d 895, 913 (9th Cir. 2001) (applying the deliberate indifference standard to claim that prison officials failed to act on rumors that Hispanic inmates were planning to attack Black inmates); Williams v. Mueller, 13 F.3d 1214, 1216 (8th Cir. 1994) (explaining application of the deliberate indifference standard to a prison official's obligation to protect inmates from harm by other inmates); Walker v. Norris, 917 F.2d 1449, 1453 (6th Cir. 1990) (applying the deliberate indifference standard to claim that prison officials failed to prevent one inmate from stabbing and killing another inmate).

While this circuit has not spoken directly on this issue, we have held that a corrections officer who witnesses but fails to intervene in the beating of an inmate by other officers is culpable if the officer had a "reasonable opportunity" to intervene but refused to do so. Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002). Although Mensinger is not directly on point, it nonetheless provides support for our conclusion that the District Court erred in applying the malicious and sadistic standard of Fuentes to A.M.'s claims against the child-care workers and their immediate supervisor.

We conclude that the District Court should have analyzed A.M.'s claims against the child-care workers and their immediate supervisor using the deliberate indifference standard. The deliberate indifference standard in this context requires evidence that the Defendants were deliberately indifferent to a substantial risk of harm to A.M. and did nothing to prevent it. See Farmer v. Brennan, 511 U.S. 834 (1994).[4] Applying this standard, we believe the evidence, viewed in the light most favorable to A.M., is sufficient to present a jury question on whether the child-care workers and their immediate supervisor were deliberately indifferent to A.M.'s right to security and well-being. See Nicini, 212 F.3d at 816 (Rendell, J., dissenting) ("whether or not a defendant's conduct amounts to deliberate indifference has been described as a 'classic issue for the fact finder' and 'a factual mainstay of actions under [§] 1983'") (quoting Armstrong v. Squadrito, 152 F.3d 564, 577 (7th Cir. 1998)).

The evidence, in particular the

---

[4]We note that the claim in Farmer was based on the Eighth Amendment, not the Fourteenth Amendment. However, as we previously discussed, the contours of a state's due process obligations to detainees have not been defined. See Doe v. Washington County, 150 F.3d 920, 922 (8th Cir. 1998). We reiterate that detainees are entitled to no less protection than a convicted prisoner. See id.; Fuentes, 206 F.3d at 344.

17

numerous incident reports, supports A.M.'s contention that the child-care workers failed to intervene when altercations between A.M. and other residents began. More troubling is evidence that suggests child-care workers would allow A.M. to get beaten up because they were sick of him and he deserved it. In our view, this evidence is sufficient to prevent the grant of summary judgment. Accordingly, we hold that the District Court's grant of summary judgment in favor of Prawdzik, Considine, Traver, and Parker must be reversed.

## IV. CONCLUSION

For the reasons set forth in this opinion, we will AFFIRM the District Court's grant of summary judgment in favor of Elaine Yozviak, in her individual capacity, and Dr. Mark Puffenberger, in his individual and official capacities. However, we will REVERSE the District Court's grant of summary judgment in favor of the Center, Sandra Brulo and Louis Kwarcinski, in their official and individual capacities, and Jerome Prawdzik, Chris Traver, Chris Parker, and Michael Considine, in their individual capacities, and REMAND the case for further proceedings.