**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-3139
_____

DIANE ZION, individually and as Personal Representative of the Estate of Nicholas
Haniotakis; TAYLOR HANIOTAKIS; NIKKI HANIOTAKIS; BENJAMIN
HANIOTAKIS

v.

TROOPER SAMUEL NASSAN; SGT. TERRANCE DONNELLY; LT. DAVID
HECKMAN; CAPT. SHELDON EPSTEIN; COMMISSIONER FRANK
PAWLOWSKI; MAJOR TERRY SEILHAMER, In Their Individual Capacities

Samuel Nassan and Terrance Donnelly,

Appellants

_____

No. 12-3140
_____

DIANE ZION, individually and as Personal Representative of the Estate of Nicholas
Haniotakis; TAYLOR HANIOTAKIS; NIKKI HANIOTAKIS; BENJAMIN
HANIOTAKIS

v.

TROOPER SAMUEL NASSAN; SGT. TERRANCE DONNELLY; LT. DAVID
HECKMAN; CAPT. SHELDON EPSTEIN; COMMISSIONER FRANK
PAWLOWSKI; MAJOR TERRY SEILHAMER, In Their Individual Capacities

Sheldon Epstein, David Heckman, Frank Pawlowski, Terry Seilhamer,

Appellants

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(No. 2-09-cv-00383)
District Judge: Honorable Joy Flowers Conti

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 27, 2013

_____

Before: CHAGARES, VANASKIE, and SHWARTZ, Circuit Judges.

(Filed: January 30, 2014)

_____

OPINION
_____

CHAGARES, Circuit Judge.

Several plaintiffs filed a lawsuit against Pennsylvania officials under 42 U.S.C. § 1983 based on the shooting death of Nicholas Haniotakis by two police officers in Pittsburgh. Trooper Samuel Nassan and his co-defendants seek interlocutory review of the District Court's denial of their motion for judgment on the pleadings and assert that the District Court incorrectly held that they were not entitled to qualified immunity. We have jurisdiction to review the District Court's judgment, and we will affirm.

I.

We write solely for the parties and will therefore recount only those facts that are essential to our disposition. The amended complaint alleges that Haniotakis was driving a sport utility vehicle ("SUV") in the early morning hours of March 15, 2009. Two

2

officers began following Haniotakis's car, claiming that it had a broken headlight. Police dispatch instructed the officers to stop following the car, but they refused. Haniotakis stopped his vehicle,[1] and the officers approached with their weapons drawn. Both shot their guns into Haniotakis's car, and one bullet went through his back, causing his death. Based on the incident, the plaintiffs seek relief through § 1983 against the officers who shot Haniotakis (Samuel Nassan and Terrance Donnelly) and their supervisors for violations of the Fourth Amendment. The plaintiffs also seek damages for assault and battery.

In October 2011, the defendants filed for judgment on the pleadings, claiming that they were entitled to qualified immunity based on the allegations contained in the amended complaint. The District Court denied the motion, explaining that if the officers did not reasonably believe that Haniotakis posed a threat to others' physical well-being, it was unconstitutional to apply deadly force. The defendants now appeal that decision.

## II.

We must first address whether we have jurisdiction.[2] After the appeal was filed, the Clerk of Court issued an order requiring the parties to file briefs addressing whether we had jurisdiction over this interlocutory appeal.

Federal appellate courts generally have jurisdiction only over "final decisions" of the district courts, pursuant to 28 U.S.C. § 1291, but case law has clarified that we may have jurisdiction to hear interlocutory appeals from qualified immunity decisions. This is

---

[1] It was later admitted (and incorporated into the pleadings) that the SUV collided with a parked car and then continued driving.

[2] The District Court had jurisdiction under 28 U.S.C. § 1331.

3

because qualified immunity is a defense to liability and from the burdens of litigation. Ashcroft v. Iqbal, 556 U.S. 662, 672 (2009). In Iqbal, the Court explained that it "has been careful to say that a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of § 1291." Id.; see also Bistrian v. Levi, 696 F.3d 352, 364 (3d Cir. 2012) ("The collateral order doctrine allows this appeal because it is from an order denying a motion to dismiss that raises a qualified immunity defense turning on an issue of law.").

Though the statements in Iqbal and Bistrian supporting our jurisdiction are clear, the plaintiffs rely on Johnson v. Jones, 515 U.S. 304 (1995), to argue that no jurisdiction exists here. In that case, the Court held that there was no jurisdiction over an interlocutory appeal of the denial of a summary judgment motion. The defendant police officers in Johnson sought to invoke qualified immunity by arguing that after discovery there was no evidence that any of them had violated the plaintiff's constitutional rights. The Supreme Court held that Courts of Appeals have no jurisdiction to review district court summary judgment decisions that hinge on the sufficiency of evidence; appellate review should be limited to questions of law, because appellate courts' proper function is to review the law, not to review large volumes of evidence. Id. at 316-17.

Here, the District Court's decision was made on a motion for judgment on the pleadings, and it was not based on sufficiency of the evidence. The plaintiffs nevertheless try to fit this case under Johnson, arguing that there is a factual dispute at this stage because the defendants have refused to accept the facts pleaded in the amended complaint. While the defendants undoubtedly dispute the facts alleged by the plaintiffs,

4

the District Court accepted the facts pled in the amended complaint, and its decision was based on a legal issue rather than on any judgment concerning sufficiency of the evidence. Like the District Court, we will simply apply the law to the facts pled in the amended complaint. Therefore, we have jurisdiction over this appeal.

## III.

We now turn to whether the District Court correctly denied the defendants' motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). Our review of the District Court's decision is plenary. Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008). Thus, we must view the facts in the light most favorable to the plaintiffs and reverse the District Court only if the defendants have established that they are entitled to judgment as a matter of law. See id.

To determine if a shooting violated the Fourth Amendment's prohibition on unreasonable seizure, we inquire as to the reasonableness of the officer's belief concerning the level of force required. Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007). We must look closely at the circumstances of each case, considering the severity of the crime, the potential threat to the safety of the officers and others, and whether the suspect is fleeing or evading arrest. Id. at 207.

## A.

Nassan and Donnelly argue that even if their conduct violated the Fourth Amendment, they are protected by qualified immunity. Officials benefit from qualified immunity unless their conduct violates clearly established law. Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011). "We do not require a case directly on point, but existing

5

precedent must have placed the statutory or constitutional question beyond debate." Id. at 2083 (explaining that there must be enough clarity such that "every reasonable official would have understood that what he is doing violates that right") (quotation marks omitted). We must therefore determine whether it was clearly established that if the facts alleged by the plaintiffs are true, the officers' actions were unconstitutional.

The Supreme Court set forth general precepts concerning the use of deadly force against a suspect in Tennessee v. Garner, 471 U.S. 1 (1985). In that case, an unarmed fifteen year-old broke into a house and stole ten dollars and a purse. A police officer arrived on the scene when the suspect was climbing a six-foot fence in order to escape. When the suspect ignored commands to stop, the officer shot him in the back of the head (which killed him), apparently in accordance with Tennessee law. The Court explained that it is not always permissible to use deadly force to prevent the escape of felony suspects, and held that if there is no immediate threat to the officer or others, deadly force is unjustified. Id. at 11. Because the suspect was not a threat and the officer only shot him to prevent escape, the Court held that the use of deadly force was unconstitutional.

We applied Garner in Abraham v. Raso, 183 F.3d 279 (3d Cir. 1999). In that case, Abraham was seen stealing merchandise from a Macy's store at a mall, and Raso (an off-duty police officer working as a mall security guard) followed him out of the store into the parking lot. Abraham got in his car and backed out, hitting another car in the process. As Abraham began driving forward, Raso shot and killed him. The district court granted summary judgment in favor of Raso. We reversed, emphasizing that Garner "concluded that the government's interest in effective law enforcement was insufficient to justify

6

killing fleeing felons who did not pose a significant threat of death or serious injury to anyone." Id. at 288.[3] Summary judgment was improper because it was unclear whether Raso was in front of (and thus endangered by) Abraham's car when he began driving away. Some evidence, such as the angle of the bullet wound, indicated that she had fired from beside the driver's window. And even if she had been in danger at some point, we held that a jury could have found that she only fired after she had moved out of the path of the car. Id. at 294.

Abraham requires us to conclude that the pleadings contain facts demonstrating a Fourth Amendment violation. The facts we must accept state that the officers followed Haniotakis's car for a short time and were directed by dispatch or a superior officer to discontinue the pursuit. After Haniotakis collided with a parked car, he continued down the street "at or below the posted speed limits," which did not exceed twenty-five miles per hour.[4] Appendix ("App.") 495-97. The shots were fired when Haniotakis was moving his vehicle forward, and the angle of the shots indicates that Nassan was not directly behind Haniotakis's car when the shots were fired. App. 502-03. Continuing to drive at a relatively slow speed away from the police after a minor collision with a parked car does not create a level of danger to justify the use of deadly force. While the

---

[3] We asked: "Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others?" Id. at 289.
[4] The officers' argument in favor of reasonableness is that Haniotakis at one point backed his car toward them, creating danger. The plaintiffs' reply to the officers' additional allegations of qualified immunity specifically "den[ies] that Mr. Haniotakis backed his SUV towards Nassan." Appendix ("App.") 501.

plaintiffs' allegations may not ultimately be proven, the facts as pled would clearly subject the officers to liability under <u>Abraham</u> because Haniotakis's behavior was no more dangerous than Abraham's and the level of force used was identical.

The defendants argue that even if there was a Fourth Amendment violation, they are entitled to qualified immunity because two Supreme Court cases decided after <u>Abraham</u> altered the law and perhaps overruled <u>Abraham</u>. In <u>Brosseau v. Haugen</u>, 543 U.S. 194 (2004), a police officer (Brosseau) responded to reports of a fight in a residential neighborhood. Haugen ran to hide from Brosseau, and several officers searched for him. When the officers saw Haugen, he jumped into his Jeep, and Brosseau believed he was looking for a weapon. She pointed her gun at Haugen and ordered him to exit the car, but he ignored her and they scuffled for the keys. <u>Id.</u> at 196. He started the car and she jumped back, then shot Haugen in the back through the rear driver's side window. <u>Id.</u> at 196-97.

The Court of Appeals for the Ninth Circuit reversed the district court's grant of summary judgment, holding that the Fourth Amendment had been violated and that Haugen's rights were clearly established. The Supreme Court did not decide whether the shooting was unconstitutional, but held that Brosseau was entitled to qualified immunity. It held that <u>Garner</u> was too general to provide sufficient guidance in this situation. <u>Id.</u> at 199. Because cases with similar factual patterns had come out in different ways, this case was at the "hazy border between excessive and acceptable force." <u>Id.</u> at 201 (quotation marks omitted). Most importantly for our purposes, the Court specifically noted that the shooting in <u>Brosseau</u> occurred before our <u>Abraham</u> decision, and therefore <u>Abraham</u>

8

"could not have given fair notice to Brosseau" and was "of no use in the clearly established inquiry." Id. at 200 n.4.

In Scott v. Harris, 550 U.S. 372 (2007), a suspect led police on a car chase down a two-lane road at speeds of over eighty-five miles per hour. After ten miles and a previous collision, one officer hit his bumper against the rear of the suspect's car, causing the car to crash and severely injure the suspect. Id. at 375. The Court of Appeals for the Eleventh Circuit affirmed the district court's denial of the defendant's summary judgment motion. Id. at 376. The Supreme Court reversed, holding that the officer's actions did not violate the Fourth Amendment. In reaching its decision, the Court, after viewing a videotape of the events, focused on the danger created by the chase: the car was moving "shockingly fast," "in the dead of night," running red lights and frequently crossing the double-yellow line, forcing other cars to the shoulder. Id. at 379. The Court also explained that Garner had little application to Scott because of the "vastly different facts" — first, Garner involved shooting a suspect while Scott involved bumping a fleeing car, creating different levels of danger for the suspect. Id. at 383. Second, an unarmed suspect fleeing on foot was not "remotely comparable" to the danger created by a high-speed car chase. Id. The Court also found it appropriate to consider the relative culpability of actors when a police officer determines whether to use force — it is better to risk the life of a fleeing suspect than innocent bystanders. Id. at 384.

The defendants maintain that Brosseau and Scott contradict Abraham to such a degree that it is no longer good law, and that consequently there was no clearly-

9

established rule to guide the officers here.[5]  We disagree.  First, we have continued to cite

Abraham as good law.  See Lamont v. New Jersey, 637 F.3d 177, 184 (3d Cir. 2011)

(citing Abraham's statement that "[a] passing risk to a police officer is not an ongoing

license to kill an otherwise unthreatening suspect").  Second, as noted by the District

Court, the shooting in Brosseau occurred before Abraham was decided (and occurred

within a different judicial circuit); since the Court in Brosseau did not opine on the

constitutional question but relied only on qualified immunity, its conclusion that the law

was unclear at that time is of little consequence to our decision.  Finally, unlike Abraham,

neither Brosseau nor Scott contained facts comparable to those found in Zion's pleadings.

Both Brosseau and Scott came to the Supreme Court after summary judgment motions,

and the facts developed demonstrated a higher level of danger (to officers and the public)

than the situation described in Zion's pleadings.  And even with the higher level of

danger in Scott, the Supreme Court specifically noted the fact that the officer's decision

to bump the suspect's car was not as dangerous as deciding to shoot the suspect.  550

U.S. at 384.

---

[5] The defendants also cite and briefly describe ten cases from various Courts of Appeals that involved some type of vehicular flight, asserting that these cases support their position.  Nassan Br. 41-43.  Almost all of the cases were decided on summary judgment, and most included facts demonstrating a level of danger significantly higher than that contained in the pleadings here.  The case most comparable to this one is Long v. Slaton, 508 F.3d 576 (11th Cir. 2007), a decision in which the court reversed the district court's denial of a motion to dismiss.  In that case, a police officer was called to the scene by a man who reported that his son needed to be detained because of his "psychosis."  Id. at 578.  When the officer arrived, the son stole the officer's police car and began driving away, and the officer shot and killed the son.  These facts are still easily distinguishable from those found in the pleadings here, and of course Abraham was not binding precedent for the Long court.

In short, contrary to the defendants' arguments, Scott and Abraham are in fact in harmony:  it may be reasonable for an officer to bump a car off the road to stop a reckless driver who is placing others in peril, while simultaneously unreasonable to shoot directly at a driver who is coming toward an officer when the officer has the opportunity to move out of the way.

While it is entirely possible that discovery will show that Haniotakis's actions put the officers or the public in significant danger, the facts contained in the pleadings do not demonstrate danger that would justify the use of deadly force.  Thus, it would be premature to grant the defendants qualified immunity at this stage of the proceeding.

B.

We will also affirm the District Court's judgment as to the supervisory defendants. The amended complaint includes numerous allegations of Nassan's violent propensities before and during his employment as a Pennsylvania state trooper.  The amended complaint specifically alleges that the supervisory defendants were aware of a 2008 jury finding that Nassan was liable for the shooting death of a twelve-year-old boy.  App. 189-91, 197.  The supervisors allegedly did not order additional training for Nassan, and one of them allegedly ordered a subordinate to alter Nassan's employment records.  App. 198. These allegations establish that the supervisory defendants were aware of a pattern of violent behavior by Nassan and did nothing to remedy the situation.  At the time of the shooting, binding precedent held that a supervisor may be liable for his subordinate's constitutional violations if the supervisor "had knowledge of and acquiesced in" the violations.  A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Detention Ctr., 372 F.3d 572,

11

586 (3d Cir. 2004). Because the legal norms allegedly violated by the supervisory defendants were clearly established at the time of the challenged actions, we will affirm the District Court's judgment as to the supervisory defendants as well.

IV.

For the foregoing reasons, we have jurisdiction to hear this appeal and we will affirm the judgment of the District Court.