PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-3959

_____

LAWRENCE THOMAS,
                            Appellant

v.

CUMBERLAND COUNTY; GLENN SANDERS, both
individually and in his official capacity  as the Warden of the
Cumberland County Correctional Facility; CORRECTIONS
OFFICER MARTINEZ, both individually and in his official
capacity as a Correctional Officer; JOHN DOES 1-10, sued in
their individual and official capacities; LIEUTENANT
MICHAEL PALAU, both Individually and in his official
capacity as a Policy Maker of Cumberland County Jail;
CAPTAIN KENNETH LANCKEN, both individually and in
his official capacity as Policy Maker of Cumberland County
Jail; CORRECTIONAL OFFICER JAMES H. WILDE, III
both individually and in his official Capacity as Correctional
Officer

_____

On Appeal from the United States District Court for the
District of New Jersey

(D. N.J. No. 1-09-cv-01323)

District Judge: Honorable Jerome B. Simandle

_____

Argued October 30, 2013

Before: FISHER, JORDAN and SLOVITER, *Circuit Judges*.

(Filed: April 11, 2014 )

Lauren Plevinsky, Esq.

William A. Riback, Esq.   ***ARGUED***

132 North Haddon Avenue

Haddonfield, NJ 08033

Steven L. Rothman, Esq.   ***ARGUED***

Lipman, Antonelli, Batt, Dunlap, Wodlinger & Gilson

110 North 6th Street

P.O. Box 729

Vineland, NJ 08362

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

Lawrence Thomas brought this suit under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2, after he sustained an attack at the hands of other inmates at the Cumberland County Correctional Facility (the "CCCF"). The attack occurred after a several-minute long verbal argument between Thomas and a group of inmates in the presence of corrections officers. Thomas brought suit against Cumberland County and policymakers at the prison (together, the "County") for, among other things, their failure to properly train corrections officers in conflict de-escalation and intervention techniques. The District Court granted summary judgment in the County's favor on Thomas's failure-to-train claim. For the reasons that follow, we will vacate the District Court's order.

3

I.

A.

Lawrence Thomas entered Cumberland County's custody on June 4, 2008.[1] He was confined in the CCCF pending trial for shoplifting and failing to pay fines that he had incurred. He was assigned to the "D-Pod," a group of holding cells in the CCCF. The D-Pod is relatively small, housing only around 100 detainees. It has two levels, and the upper level is open to the lower level with stairs that connect the two. It houses minimum and medium security detainees. Thomas was a minimum security detainee.

The CCCF is considered a tough prison, due in large part to gang activity. At least four or five fights are seen and reported every day, and up to twenty or thirty are estimated to be unseen and unreported. The County knew of these conditions by way of incident reports filed for the fights that are seen and reported.

During his detention, Thomas developed a reputation as a bully. He was known for stealing others' food. This suit concerns Thomas's conflict with a group of inmates in the D-Pod, which occurred on July 27, 2008. Two corrections officers were on duty in the D-Pod that day – Corrections Officer Fernando Martinez ("Officer Martinez") and Corrections Officer James Wilde ("Officer Wilde"). Thomas

---

[1] This account of the facts derives from evidence in the summary judgment record and construes the evidence in the light most favorable to Thomas.

4

claims he was "bartering" for food,[2] and after acquiring rice and soup, he left his cell to microwave the food. When he exited, he found that a crowd of about twelve inmates had gathered outside of his cell. Officer Martinez was also among the crowd. The inmates were angry with Thomas, believing that he had stolen food.

The argument, which began outside of Thomas's cell on the upper level of the D-Pod, grew into a heated verbal dispute that lasted for several minutes. Throughout the argument, Officer Martinez was with the crowd while Officer Wilde was at his desk on the lower level of the D-Pod. At some point, Officer Martinez said something along the lines of, "If you guys don't fight or break it up, I'm going to lock everybody down." (PA 91, 154). In response to this statement, the crowd of inmates laughed. The statement did not cause the crowd to disperse.

While Thomas, Officer Martinez, and the crowd were on the upper level, another inmate, Leonardo Santiago, yelled from the lower level, "If you want to take stuff from people, come down here and take stuff from me." (PA 120, 150). At this time, Thomas began to make his way downstairs to the lower level, allegedly to seek the protection of Officer

---

[2] Thomas states that he was "bartering" – he was borrowing food and would pay it back with double the amount on commissary day. Other inmates described his actions as stealing.

5

Wilde.[3]   As he headed down, other inmates started yelling explicit threats of violence at Thomas, both from the lower level and from the crowd behind him on the stairs and on the upper level.

Thomas stated that when he reached the lower level, the crowd was blocking his path to Officer Wilde's desk.  He moved towards Santiago's cell.  Within fifteen or twenty seconds after Thomas reached the lower level, Santiago struck Thomas.  Santiago stated that he struck Thomas partially in self-defense, because Thomas was approaching him in a threatening manner.  Officer Martinez attempted to restrain Santiago, but at this time, another inmate, Michael Cruz, struck Thomas twice.  When Thomas was injured, Officer Martinez was immediately next to him.  Officer Martinez yelled for everyone to lock down, and the inmates reluctantly complied.  The total time that elapsed between the beginning of the argument on the upper level and the violence that erupted on the lower level was three or four minutes.

Neither Officer Martinez nor Officer Wilde took any action to quell the unrest as the argument progressed.  One inmate testified that he could tell that a fight was imminent and wanted to see a fight happen.  Other inmates stated that the officers could and should have stopped the argument before the violence occurred.  Officer Martinez acknowledged that he saw the entire incident.  Thomas suffered a serious eye injury and a concussion.  He was left with no sight in one eye.

---

[3] Other inmates stated that Thomas was heading downstairs in an aggressive manner to confront Santiago. Thomas, by contrast, maintained that he was heading down to the lower level in order to reach and seek protection from Officer Wilde.

In New Jersey, new corrections officers must complete pre-service training and Academy training. The CCCF provides a three-week pre-service training program with materials from the state. New corrections officers are required to complete this program prior to assuming their duties. A corrections officer must then complete state-provided Academy training within the first twelve to eighteen months of employment. The CCCF does not, as a part of its pre-service training, include training on de-escalating or intervening in conflicts before violence occurs. The officers do not receive specific training on calling for back-up; instead, they must use their discretion based on the training that they do receive. Both Officer Martinez and Officer Wilde had completed pre-service training, but because they had been working at the CCCF for less than one year, they had not yet completed Academy training.

Thomas obtained an expert report from Dr. Richard Kiekbusch regarding the need for de-escalation and intervention training and the failure to intervene in this situation. Dr. Kiekbusch, a professor of criminology, has over twenty years of experience in correctional administration. Dr. Kiekbusch reviewed materials in the summary judgment record and also relied on materials on national standards for prison training, with which he was familiar. He observed that the CCCF does not have any training on defusing a volatile situation with an inmate, de-escalating inmate tension, intervening in situations of inmate unrest, or calling for back-up when control requires additional personnel. He explained that prison training programs across the country proactively address the use of intervention and de-escalation skills and calling for back-up to defuse inmate tension and unrest.

Dr. Kiekbusch observed that the CCCF administration "failed to provide pre-service training to its correctional officers regarding the de-escalation of inmate tension and unrest and calling for back-up in situations in which maintaining control of the inmates under their supervision has exceeded, or is likely to exceed, the capabilities of those officers." (PA 56). He concluded that Officer Martinez failed to intervene in the rising inmate tension or call for back-up to help quell the argument and that Officer Martinez's failure to intervene contributed to the injuries that Thomas sustained. Based upon his education, training, and experience in jail management, Dr. Kiekbusch found that the CCCF's failure to provide training on de-escalation, intervention, and when to call for back-up "to be a careless and dangerous practice, and one which reflects a deliberate indifference to inmate health and safety." (PA 61).

## B.

Thomas filed a complaint in the United States District Court for the District of New Jersey. He later filed a second amended complaint that included claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2. The complaint named Cumberland County and policymakers at the prison along with Officers Martinez and Wilde as defendants.

On April 5, 2011, all defendants filed a motion for summary judgment and a motion to exclude the expert testimony of Dr. Kiekbusch. The District Court granted summary judgment on all claims against the County and Officer Wilde. It denied summary judgment with respect to Thomas's claims against Officer Martinez for failure to protect, failure to intervene, and incitement. It also denied the motion to exclude Dr. Kiekbusch's expert testimony.

8

Thomas's claims against Officer Martinez proceeded to trial. The jury found in favor of Officer Martinez, concluding that he was aware of the danger that Thomas faced, but was not willfully indifferent. The District Court entered final judgment and Thomas filed a timely notice of appeal. Thomas appeals only the District Court's grant of summary judgment in the County's favor on the section 1983 failure-to-train claim.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

"We review the District Court's disposition of a summary judgment motion *de novo*, applying the same standard as the District Court." *Doe v. Luzerne Cnty.*, 660 F.3d 169, 174 (3d Cir. 2011). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535 (3d Cir. 2007). A motion for summary judgment is properly denied if "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.

III.

The sole issue on appeal is the County's municipal liability under section 1983 for its failure to provide pre-service training on conflict de-escalation and intervention techniques. A municipality cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by the municipality's policy or custom. *Id.* at 690-91. Liability is imposed "when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of one of its employees." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991) (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)).

Where the policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("*Canton*")). Additionally, "the identified deficiency in a city's training program must be closely related to the ultimate injury;" or in other words, "the deficiency in training [must have] actually caused" the constitutional violation. *Canton*, 489 U.S. at 391.

The parties do not challenge the existence of a policy or of a constitutional violation on appeal. The relevant policy for the purposes of municipal liability is the County's decision not to provide conflict de-escalation and intervention

10

training as a part of pre-service training for corrections officers. The alleged constitutional violation stems from the officers' failure to "take reasonable measures to protect prisoners from violence at the hands of other prisoners."[4] *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (internal quotation marks omitted). We will focus on whether the failure to provide pre-service training on conflict de-escalation and intervention amounts to deliberate indifference, and whether this deficiency in training caused Thomas's injury.

## A.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty.*

---

[4] This duty to protect a prisoner from other prisoners has been read as a limitation on punishment from the Eighth Amendment's prohibition against cruel and unusual punishment. *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). As a pretrial detainee, Thomas is not subject to the Eighth Amendment's protections; rather, the Fourteenth Amendment's Due Process Clause governs. *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 579 (3d Cir. 2004). This Court has applied the same standard to a failure-to-protect claim under the Fourteenth Amendment as under the Eighth Amendment. *Id.* A prisoner has a valid failure-to-protect claim if the prison official shows "'deliberate indifference' to a substantial risk of serious harm to an inmate." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Officer Martinez's failure to protect Thomas, on which the District Court denied summary judgment, is therefore the relevant constitutional injury for the purposes of the County's municipal liability.

11

*Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) ("*Bryan Cnty.*"). Ordinarily, "[a] pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, -- U.S. --, --, 131 S. Ct. 1350, 1360 (2011). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and "[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." *Bryan Cnty.*, 520 U.S. at 407.

Nevertheless, the Supreme Court posited in *Canton* that in certain situations, the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights" even without a pattern of constitutional violations. 489 U.S. at 390 n.10. The Court offered a hypothetical example of this "single-incident" failure-to-train liability. Because "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," if the city arms the officers with firearms, "the need to train officers in the constitutional limitations on the use of deadly force" is "so obvious" that a failure to provide such training could provide a basis for single-incident municipal liability. *Id.* Liability in single-incident cases depends on "[t]he likelihood that the situation will recur and the predictability

12

that an officer lacking specific tools to handle that situation will violate citizens' rights." *Bryan Cnty.*, 520 U.S. at 409.

The Supreme Court recently examined the applicability of single-incident liability in *Connick v. Thompson*, where an exonerated convict sought to hold the New Orleans District Attorney liable for failing to train prosecutors on discovery disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), with respect to the specific types of evidence in his case. *Connick*, 131 S. Ct. at 1355. In finding that the failure to train did not "fall within the narrow range of *Canton*'s hypothesized single-incident liability," *Connick*, 131 S. Ct. at 1361, the Court highlighted prosecutors' legal training and professional obligations, which differentiate them from other public employees. *Id.* at 1361-63. Unlike armed police officers who "must sometimes make split-second decisions with life-or-death consequences" and have no reason to be "familiar with the constitutional constraints on the use of deadly force," *id.* at 1361, "[p]rosecutors are not only equipped but are also ethically bound to know what *Brady* entails and to perform legal research when they are uncertain," *id.* at 1363. "In light of this regime of legal training and professional responsibility, recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409). The Court also differentiated the situation from the example in *Canton* due to "the nuance of the allegedly necessary training." *Id.* Because prosecutors were familiar with the general *Brady* rule, Thompson's claim relied on a failure to train "about particular *Brady* evidence or the specific scenario related to the violation in his case," and "[t]hat sort of nuance simply cannot support an inference of deliberate indifference." *Id.*

13

We have previously found that a single-incident constitutional violation was sufficient to preclude summary judgment on a failure-to-train claim against a municipality. In *Berg v. County of Allegheny*, the plaintiff was wrongly arrested pursuant to a warrant that was erroneously issued when a clerk transposed two numbers. 219 F.3d 261, 266 (3d Cir. 2000). The plaintiff sought to hold the county liable for its poor training procedures on the warrant-creation process. *Id.* at 275. We held that summary judgment was not appropriate, because "[h]aving employed a design where the slip of a finger could result in wrongful arrest and imprisonment, there remains an issue of fact whether the County was deliberately indifferent to an obvious risk." *Id.* at 277. The failure to provide protective measures and training to prevent the mistake was "comparable to 'a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409).

We have also previously addressed a failure-to-train case involving the need for conflict de-escalation training. In *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center*, a child confined in a juvenile facility who was physically assaulted by other residents sought to hold the facility liable for its lack of training on conflict de-escalation and management of youth behavior. 372 F.3d 572, 575, 580 (3d Cir. 2004). The facility had offered no training on de-escalating conflicts or identifying children who could be victimized by others. *Id.* The plaintiff presented expert opinion evidence that the training program was not adequate and did not meet nationally recognized standards. *Id.* at 582. We observed that "the evidence supports an inference that the potential for conflict between residents of the Center was high" and concluded that "the evidence concerning the

14

Center's failure to train its child-care workers in areas that would reduce the risk of a resident being deprived of his constitutional right to security and well-being was sufficient to prevent the grant of summary judgment." *Id.* at 583.

Thomas advances a single-incident theory of liability, arguing that a jury could find that the CCCF was deliberately indifferent "when 'patently obvious' standards, widely-accepted national standard[s] and training relevant to inmate safety were disregarded, at the same time their Corrections Officers were confronting a combustible jail." (Appellant's Br., at 10). To find deliberate indifference from a single-incident violation, the risk of Thomas's injury must be a "highly predictable consequence" of the CCCF's failure to provide de-escalation and intervention training as a part of pre-service training for corrections officers. *Connick*, 131 S. Ct. at 1361.

Thomas put forward evidence that fights regularly occurred in the prison. While these fights are not sufficient to create a pattern of violations, because there is scant evidence that they resulted in constitutional violations, they are relevant to whether his injury was a "highly predictable consequence" of the failure to train on de-escalation techniques for single-incident liability. A reasonable jury could conclude based on the frequency of fights and the volatile nature of the prison that the "predictability that an officer lacking [de-escalation and intervention training] to handle that situation will violate rights" and the "likelihood that the situation will recur" demonstrate deliberate indifference on the County's part. *Bryan Cnty.*, 520 U.S. at 409. Thomas also provided expert opinion evidence that the failure to provide conflict de-escalation and intervention training was a careless and dangerous practice not aligned with prevailing standards. Viewing the evidence in the

15

record, including Dr. Kiekbusch's expert opinion, in the light most favorable to Thomas, a reasonable jury could find that the County acted with deliberate indifference.

Thomas's case for single-incident liability falls somewhere between the plainly obvious need to train armed police officers "in the constitutional limitations on the use of deadly force" in *Canton*, 489 U.S. at 390 n.10, and the lack of such an obvious need in *Connick*, where prosecutors had a legal education and ethical obligations and the allegedly necessary training was nuanced, 131 S. Ct. at 1363. However, the case here is more similar to the hypothetical in *Canton* than to the situation in *Connick*. Like the police officers in *Canton*, corrections officers have no reason to know how or when to de-escalate a conflict to avoid a constitutional violation for failure to protect. Given the frequency of fights occurring between inmates in the CCCF that could lead to constitutional violations for failure to protect, the lack of training here is akin to "a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bryan Cnty.*, 520 U.S. at 409 (discussing the single-incident hypothetical in *Canton*, 489 U.S. at 390 n.10).

In contrast to *Connick*, the officers here have no reason to have an independent education, knowledge base, or ethical duty that would prepare them to handle the volatile conflicts that might lead to inmate-on-inmate violence. Also unlike in *Connick*, there is no nuance to the training Thomas seeks to require. While the prosecutors in *Connick* had some knowledge of *Brady*'s requirements, corrections officers had no de-escalation or intervention training as a part of their pre-service training.

16

Thomas's case is not precisely analogous to either *Berg* or *A.M. ex rel. J.M.K.*, but there are enough similarities such that the District Court should not have precluded the factual issues underlying the deliberate indifference determination from going to a jury. Like in *Berg*, the County "fail[ed] to provide protective measures and fail safes" to prevent mistakes in a situation that occurs frequently. 219 F.3d at 277. And similar to *A.M. ex rel. J.M.K.*, the potential for conflict was high and there was a complete lack of training on de-escalation and intervention. While the juvenile facility and the series of assaults on the plaintiff in *A.M. ex rel. J.M.K.* differentiate it from this case, these differences do not justify discounting factual issues to conclude that the County was not deliberately indifferent as a matter of law. We therefore hold that there was sufficient evidence for the question of whether the County acted with deliberate indifference to survive summary judgment and proceed to a jury.

## B.

In addition to deliberate indifference, "*City of Canton* teaches that to sustain a claim based on a failure to train theory, 'the identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury.'" *Colburn*, 946 F.2d at 1028 (alterations in original) (quoting *Canton*, 489 U.S. at 391). The failure to train must have "a causal nexus with [the plaintiff's] injury." *Id.* at 1030. In analyzing causation, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Canton*, 489 U.S. at 390. Liability cannot rest only on a showing that the employees "could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury." *Colburn*, 946 F.2d at 1029-30. Rather,

17

the causation inquiry focuses on whether "the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Canton*, 489 U.S. at 391.

Causation is a requirement for failure-to-train liability that is separate from deliberate indifference; however, "[t]he high degree of predictability [in a single-incident case] may also support an inference of causation – that the municipality's indifference led directly to the very consequence that was so predictable." *Bryan Cnty.*, 520 U.S. at 409-10. The causation inquiry – "[p]redicting how a hypothetically well-trained officer would have acted under the circumstances" – "may not be an easy task for the factfinder, particularly since matters of judgment may be involved." *Canton*, 489 U.S. at 391. Nonetheless, "judge and jury, doing their respective jobs, will be adequate to the task." *Id.*

Thomas put forward evidence from Santiago – the first inmate who struck Thomas – that the officers could have stopped the argument before violence broke out. He also presented an inmate witness's statement that the officers allowed the inmates to fight. There is ample evidence in the record that Martinez was present throughout the argument, which lasted for several minutes, before Thomas was struck. Thomas offered expert opinion evidence that the CCCF's lack of de-escalation training, among other things, contributed to the serious injuries that Thomas sustained. Similar expert opinion evidence was offered to preclude summary judgment in *A.M. ex rel. J.M.K.* *See* 372 F.3d at 582 ("In [the expert's] opinion, the Center's failure to train its staff and follow other recognized standards for the operation of juvenile detention facilities directly contributed to the inappropriate treatment of A.M. while he was detained."). Presented with this evidence

18

and using their judgment and common sense, a reasonable jury could have concluded that the lack of training in conflict de-escalation and intervention caused Thomas's injuries.

## IV.

Viewing the evidence in the record in the light most favorable to Thomas, we conclude that there are genuine issues of material fact as to whether the County exhibited deliberate indifference to the need for pre-service training in conflict de-escalation and intervention and whether the lack of such training bears a causal relationship to Thomas's injuries. Accordingly, we will vacate the District Court's grant of summary judgment in the County's favor so that a factfinder may consider these issues. We remand the case to the District Court for further proceedings consistent with this opinion.