**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 19-2938

TAMIKA JOHNSON, Individually and as Administratrix of the
Estates of Alita Johnson, Horace McCouellem, and Haashim Johnson,
Appellant

v.

CITY OF PHILADELPHIA; PHILADELPHIA FIRE DEPARTMENT; ADAM THIEL,
Philadelphia Fire Department; JANE DOE, Philadelphia Fire Department Operator;
JANE DOE, Philadelphia Fire Department Dispatcher

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 2-18-cv-4655)
District Judge: Hon. Joel H. Slomsky

Argued May 26, 2020

Before: GREENAWAY, JR., PORTER, and MATEY, *Circuit Judges*

(Opinion filed: September 22, 2020)

Thomas A. Lynam, III
Leonard G. Villari [ARGUED]
Villari Lentz & Lynam
100 North 20th Street
Suite 302
Philadelphia, PA 19103
        *Counsel for Appellant*

Kelly S. Diffily
Craig R. Gottlieb
Jane L. Istvan [ARGUED]
City of Philadelphia Law Department
17th Floor
1515 Arch Street
Philadelphia, PA 19102
        *Counsel for Appellees*

---

OPINION

---

MATEY, *Circuit Judge*.

Alita Johnson, her son Haashim Johnson, and her stepfather Horace McCouellem died in a fire that engulfed their Philadelphia apartment. In the glare of hindsight, their deaths seem senseless. With the building already burning, Ms. Johnson called 911. A fire department operator instructed her to remain inside, promising help was on the way. But a cascade of errors followed: firefighters initially drove to the wrong location and then, once at the scene, never learned that Ms. Johnson and her family were waiting. So the firefighters extinguished the blaze without a search, leaving all three trapped in their home where they perished from smoke inhalation. Days would pass before firefighters returned and discovered their bodies.

Seeking answers and redress, the administratrix of the decedents' estates sued the city and two fire department employees. Her claims rest largely on the theory that the defendants caused the deaths by making mistake after mistake. Few will deny the seriousness of those errors. Fewer still will deny that the grieving survivors deserve the peace that truth might bring. But not every injury has a legal remedy, and courts, particularly federal courts, may provide relief in limited circumstances. As those conditions do not exist here, we must affirm the District Court's decision to dismiss.

2

## I. BACKGROUND

We sketch the story behind this action by drawing from the allegations in the complaint. As we review a decision granting a motion to dismiss, we assume those allegations are true and draw all reasonable inferences from them in the plaintiff's favor. *See Haberle v. Troxell*, 885 F.3d 170, 174 n.1 (3d Cir. 2018).

### A. The Johnson Family's Death

Ms. Johnson, her son, and her stepfather (here, for convenience, "the Johnson Family") rented an apartment in a Philadelphia rowhome. Long before the fire, problems plagued the building. In 2014, the city's Department of Licenses and Inspections sued the building's owners, Granite Hill Properties LLC and Tyrone Duren, for illegally operating a boarding home. The owners agreed to vacate the property but later resumed renting to multiple tenants, including the Johnson Family.

Late one evening in 2018, a fire ignited on the building's second floor. Alita Johnson did what anyone would do and called 911. Once connected, the phone operator directed city firefighters to the address of the burning building. The incorrect address, it turns out, sending emergency responders the wrong way. In the meantime, 911 transferred Ms. Johnson to an operator with the Philadelphia Fire Department's emergency call center ("Operator").

Ms. Johnson told the Operator that she and her family were inside the burning building, in a room on the rear third floor. The Operator gave clear guidance in response: shut the

door, place a towel across its bottom, and open a window. Ms. Johnson did as instructed. The Operator also encouraged Ms. Johnson to remain calm, explaining that rescuers were on the way. After a few minutes, for reasons unknown, the call disconnected. That was the last communication with the Johnson Family.

During the call, the Operator discovered the address error and relayed the correct address to a fire department dispatcher ("Dispatcher"), who rerouted the rescuers. But while the location of the fire was now correct, the scope of the emergency was not, since neither the Operator nor the Dispatcher told the firefighters that the Johnson Family was waiting inside the building. So the firefighters left after extinguishing the fire without ever looking for them. Days later, after relatives reported them missing, a full search of the building found their bodies, dead from smoke inhalation.

## B.    The Federal Civil Action

Tamika Johnson, the administratrix of the Johnson Family's estates (and the "Appellant"), then sued the Operator, the Dispatcher, the City of Philadelphia ("City"), and the City Fire Commissioner.[1] The defendants moved to dismiss the

---

[1] The complaint also contained "special-relationship" claims against the Operator and the City, and an equal-protection claim against the City Fire Commissioner. The District Court dismissed these claims, and Appellant abandons them on appeal. In its dismissal order, the District Court granted Appellant leave to amend her equal-protection claim only. She declined to do so. At oral argument here,

4

complaint and, after oral argument, the District Court granted their motion. This timely appeal followed.

## II. DISCUSSION

Appellant claims that the Operator and the Dispatcher violated the Johnson Family's constitutional rights under what is known as the "state-created danger" theory, and that the City violated those rights under the theory outlined in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). She also claims that the City acted negligently under Pennsylvania law. The District Court held that Appellant failed to state any claim upon which relief could be granted. Finding no error, we will affirm.[2]

---

Appellant confirmed that she does not seek leave to amend any of her other dismissed claims.

[2] The District Court had federal-question jurisdiction over the constitutional claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a). We have jurisdiction under 28 U.S.C. § 1291. When considering a motion to dismiss under Rule 12(b)(6), a District Court asks "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief"—i.e., whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Kedra v. Schroeter*, 876 F.3d 424, 440–41 (3d Cir. 2017) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). We exercise plenary review over the District Court's resolution of that question. *Id.* at 434.

5

## A.     State-Created Danger Claims

The District Court held that, as alleged, neither the Dispatcher nor the Operator was liable for the Johnson Family's harm. Because the Dispatcher did not act affirmatively, and because the Operator's behavior did not shock the conscience, we agree.

### 1.     Origin of the State-Created Danger Theory of Liability

The state-created danger doctrine traces to a few words in the Supreme Court's opinion in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). Like the case here, the facts were disturbing. County officials allegedly learned of a father's penchant for beating his son Joshua. *Id.* at 192–93. Rather than protect the defenseless child, the officials elected against intervening, and the dad's final attack caused "brain damage so severe that [the boy was] expected to spend the rest of his life confined to an institution." *Id.* at 193. Joshua and his mother then sued, alleging, novelly, that the officials' failure to intervene violated the boy's constitutional rights. *Id.*

The Supreme Court rejected the claim. Such rights appear nowhere in the text of the Constitution, of course, and "the Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196. Rather, only "in certain limited circumstances" does "the Constitution impose[] upon the State affirmative duties of care and protection with respect to particular individuals," such as

6

prisoners and the "involuntarily committed." *Id.* at 198–99. In those cases, the State has taken an "affirmative act of restraining the individual's freedom to act on his own behalf," and that could be a "'deprivation of liberty' triggering the protections of the Due Process Clause." *Id.* at 200. But there was not that kind of "special relationship" between the county and the young boy. *Id.* at 197, 201. Further, while the county "may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201.

From those simple words—"played no part in their creation" and "render him any more vulnerable"—sprang a considerable expansion of the law. While seemingly not part of *DeShaney*'s holding, lower courts seized on those words to create a new remedy that would, it was thought, aid the next "[p]oor Joshua."[3] Thus was born the "state-created danger"

---

[3] *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 213 (1989) (Blackmun, J., dissenting). In his oft-repeated dissenting opinion, Justice Blackmun urged a "'sympathetic' reading" of the Constitution, "one which comports with dictates of fundamental justice." *Id*. As the majority noted, victims like Joshua do deserve both sympathy and action, and "[t]he people of Wisconsin may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one." *Id.* at 203. But the Constitution does not permit the courts to "thrust" that remedy upon them by an "expansion of the Due Process Clause of the Fourteenth Amendment" outside its ordinary meaning. *Id*. That is because

theory of liability, which we adopted in *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996).[4] There, a severely intoxicated husband and wife were walking home from a bar. *Id.* at 1201. Police officers stopped the couple, separated them, and allowed the man to continue on his way. *Id.* at 1201–02. The officers later "sent [the woman] home alone," but she never made it; she was "found unconscious at the bottom of an embankment" the next day. *Id.* at 1202–03. The woman's parents then sued, asserting that the officers had violated their daughter's substantive due process rights. *Id.* at 1203. But there was no "special relationship" between the state and the decedent falling within *DeShaney*'s narrow holding. *Id.* at 1205.

Charting a new course, we elevated the commentary in *DeShaney* and discovered that the Court had "left open the possibility that a constitutional violation might . . . occur[]" when a state "play[s a] part in . . . creat[ing]" a danger or when it "render[s a person] more vulnerable to" that danger. *Id.* at 1205 (quoting *DeShaney*, 489 U.S. at 201). Since the police separated the couple, "then sen[t the woman] home unescorted in a seriously intoxicated state in cold weather," the state, through its actors, "made [her] more vulnerable to harm." *Id.*

_____

"the Constitution is a written instrument" and "its meaning does not alter. That which it meant when adopted, it means now." *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 822 (2011) (Thomas, J., dissenting) (citation and internal quotation marks omitted). Rather, our Constitution reserves the virtue of sympathy to the people.

[4] Earlier cases "considered the possible viability" of the theory. *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996) (collecting cases).

8

at 1209. The danger, we explained, was not the plaintiff's intoxicated journey from tavern to domicile. *Id.* Rather, it was the "state-created danger" of removing her male companion, who presumably would have sheltered her from peril, that violated the guarantee of due process framed in the Fourteenth Amendment.[5] *Id.* at 1211.

## 2. The State-Created Danger Theory Today

Several other Circuit Courts have also recognized the state-created danger theory of liability.[6] But the Supreme Court

---

[5] Courts often treat the "state-created danger" doctrine "as if it were a rule of common law." *Weiland v. Loomis*, 938 F.3d 917, 920 (7th Cir. 2019). But it is not, and we must guard against reasoning that, especially with the best intentions, deviates from the Constitution's careful balance of authority recognized in *DeShaney*. *See Daniels v. Williams*, 474 U.S. 327, 332 (1986) ("We have previously rejected reasoning that would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976) (internal quotation marks omitted)).

[6] *See, e.g.*, *Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932 (6th Cir. 2020); *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019); *Estate of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019); *Anderson ex rel. Anderson v. City of Minneapolis*, 934 F.3d 876, 881 (8th Cir. 2019); *Matthews v. Bergdorf*, 889 F.3d 1136, 1150 (10th Cir. 2018); *Okin v. Village of Cornwall-On-Hudson Police Dep't.*, 577 F.3d 415, 428 (2d Cir. 2009). *But see Keller v. Fleming*, 952 F.3d 216, 227 (5th Cir. 2020) ("[T]he Fifth Circuit has

has not.[7] And the doctrine has not escaped criticism, since it does not stem from the text of the Constitution or any other positive law,[8] and consequently vests open-ended lawmaking power in the judiciary.[9] Moreover, the "state-created danger"

never recognized th[e] 'state-created-danger' exception."); *Turner v. Thomas*, 930 F.3d 640, 646 (4th Cir. 2019) ("[W]e have never issued a published opinion recognizing a successful state-created danger claim."); *Irish v. Maine*, 849 F.3d 521, 526 (1st Cir. 2017) ("While this circuit has discussed the possible existence of the state-created danger theory, we have never found it applicable to any specific set of facts."). One oddity of this reasoning is that it seems to create liability for the kind of action *DeShaney* did not.

[7] Nor is it certain to. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) ("As a general matter, the Court has always been reluctant to expand the concept of substantive due process[.]").

[8] *See Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 188 (4th Cir. 2010) (Wilkinson, J., concurring) ("Neither the majority nor the parties point to any instance where Congress has laid down a rule to govern the conduct in this case, and it is wrong for a federal court to rush in where Congress has feared to tread.")

[9] *See Johnson*, 597 F.3d at 184 (Wilkinson, J., concurring) ("Law exists in part to guard against the overreaching of public authority, and from that general purpose the life-tenured federal courts are not exempt. When the many cautionary maxims of restraint are toppled like dominos, the chances of judicial miscalculation exponentially increase. . . . Federal courts simply do not have a roving warrant to adopt whatever policies they believe to be beneficial, all in the name

doctrine offers little help to public employees seeking to better discharge their duties, and does not tell them "what to do, or avoid, in any situation." *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019).

But we remain bound to faithfully apply our precedent explaining the scope of the doctrine. As currently formulated, that requires a plaintiff to plead four elements: first, foreseeable and fairly direct harm; second, action marked by "a degree of culpability that shocks the conscience"; third, a relationship with the state making the plaintiff a foreseeable victim, rather than a member of the public in general; and fourth, an affirmative use of state authority in a way that created a danger, or made others more vulnerable than had the state not acted at all. *See Sauers v. Borough of Nesquehoning*,

---

of substantive due process."); *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 874 (5th Cir. 2012) (Higginson, J., concurring) (noting the "loose articulation" of the state-created danger doctrine); *cf. Collins*, 503 U.S. at 125 ("[G]uideposts for responsible decisionmaking in this unchartered area [of substantive due process] are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.") (citation omitted); *see also Kedra v. Schroeter*, 876 F.3d 424, 462 (3d Cir. 2017) (Fisher, J., concurring) ("[I]t is troubling how far we have expanded substantive due process . . . ."); *Morrow v. Balaski*, 719 F.3d 160, 186 (3d Cir. 2013) (en banc) (Ambro, J., concurring in part and dissenting in part) ("Federal courts cannot be the forum for every complaint that a government actor could have taken an alternate course that would have avoided harm to one of our citizens.").

905 F.3d 711, 717 (3d Cir. 2018). We apply that precedent to the facts Appellant pleads here.

> 3.      The Dispatcher Did Not Affirmatively Use Her Authority

The state-created danger theory requires Appellant to allege that the Dispatcher "affirmatively used . . . her authority in a way that created a danger to the [decedents] or that rendered [them] more vulnerable to a danger than had [the Dispatcher] not acted at all"—i.e., to allege an affirmative act. *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 242 (3d Cir. 2016) (quoting *Bright v. Westmoreland*, 443 F.3d 276, 281 (3d Cir. 2006)). True, we have noted the "inherent difficulty in drawing a line between an affirmative act and a failure to act," and sometimes frame the inquiry as asking whether a defendant's "exercise of authority resulted in a departure from th[e] status quo." *Id.* at 242–43. But we have repeatedly held that an alleged failure *to do something*, standing alone, cannot be the basis for a state-created danger claim. *See, e.g.*, *Burella v. City of Phila.*, 501 F.3d 134, 146–47 (3d Cir. 2007) (police officers' failure to intervene in domestic-violence situation did not satisfy element four).

Here, there are no allegations of affirmative conduct by the Dispatcher that caused the Johnson Family's harms. Rather, Appellant claims only that the Dispatcher failed to communicate the Johnson Family's location to the firefighters.[10] But this is a classic allegation of omission, a

---

[10]     (App. at 56 ("[The] Dispatcher violated the decedents' substantive due process rights by failing

12

failure to do something—in short, a claim of inaction and not action. That is not enough under our prior decisions, and so we will affirm the dismissal of that claim.

    4.    The Operator's Alleged Actions Did Not Shock the Conscience

Appellant alleges that the Operator violated the Johnson Family's constitutional rights by "directing them to close themselves inside the burning building's 3rd floor rear room, assuring them that [f]irefighters were coming to their rescue, but then failing inexplicably to inform the [f]irefighters of [their] existence, location, or need of rescue." (App. at 54.) The District Court held that those allegations do not "shock the conscience," as that phrase is defined in our precedent. We agree.

Start with the standard, recognizing that it offers little light. *See, e.g.*, *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (noting the shock-the-conscience test "is not one that can be applied by a computer, [but] it at least points the way"), *quoted in Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). We have explained that "[t]he exact level of culpability required to shock the conscience . . . depends on the circumstances of each case, and the threshold for liability varies with the state actor's opportunity to deliberate before taking action." *Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017). In "'hyperpressurized environments requiring a snap judgment,' an official must actually intend to cause harm in

inexplicably to inform the Firefighters of decedents' existence, location, or need of rescue on the 3rd floor of the burning building.".)

13

order to be liable." *Id.* (alteration omitted) (quoting *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015)). "In situations in which the state actor is required to act 'in a matter of hours or minutes,' . . . the state actor [must] 'disregard a great risk of serious harm.'" *Id.* (quoting *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006) (per curiam)). "And where the actor has time to make an 'unhurried judgment[],' a plaintiff need only allege facts supporting an inference that the official acted with a mental state of 'deliberate indifference.'" *Id.* (alteration omitted) (quoting *Sanford*, 456 F.3d at 309).

The District Court believed that the Operator faced "emergency circumstances," so the intent-to-cause-harm standard applied. (App. at 24.) On appeal, Appellant argues for a lower standard. But the claim fails even under the deliberate-indifference test. Consider the Operator's instructions and assurances. Sheltering in place rather than risking a perilous descent through a raging fire mirrors standard practices. As for the promises of timely help, Appellant notes that the Johnson Family "forwent attempting to escape the burning building by . . . another rear window that opened onto a flat, walkable roof." (App. at 51.) But she does not allege that the Operator knew about this means of escape.

The Operator's failure to communicate the decedents' location and need of rescue is also insufficient.[11] "[T]he Due

---

[11] Were this failure the sole basis of Appellant's claim against the Operator, we would affirm the dismissal of this claim for the same reason as the claim against the Dispatcher—i.e., for failure to allege an affirmative act. Appellant, however, alleges that the Operator violated the decedents' constitutional

14

Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *cf. Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) ("[C]laims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' . . . We have found 'deliberate indifference' . . . where [a] prison official . . . knows of a prisoner's need for medical treatment but *intentionally* refuses to provide it." (emphasis added)). Appellant does not allege that the Operator *intentionally* declined to relay the decedents' location to the [f]irefighters. Instead, she argues the Operator "fail[ed] *inexplicably* to inform the firefighters of the decedents'

---

rights "by a combination" of the instructions, assurances, and the failure to communicate. (App. at 54.) Because we hold that Appellant's claim against the Operator does not satisfy element two of the state-created danger theory, we need not determine whether a combination of affirmative acts and omissions satisfies element four. *Cf. Rivas v. City of Passaic*, 365 F.3d 181, 197 (3d Cir. 2004) (where EMTs falsely told police that man assaulted them, element four satisfied by, for example, EMTs' later failure to advise police about the man's medical condition and decision to "abandon control over the situation"). *But see Walter v. Pike Cty.*, 544 F.3d 182, 195–96 (3d Cir. 2008) (under state-created danger theory, a defendant's affirmative act does not impose a later duty to act if the initial act did not shock the conscience); *id.* at 196 ("[T]hese findings would not amount to a constitutional violation—they would not establish that the defendants committed a *culpable* act, only that they acted in 2001 and then, months later, shocked the conscience through inaction."). And we need not address elements one and three.

existence, location, or need of rescue." (App. at 54 (emphasis added).) But the only reasonable inference is that the Operator neglected to relay that information through error, omission, or oversight. Nothing in the complaint or, indeed, ordinary experience supports the inference that the Operator deliberately chose to discard her concern for the Johnson Family's lives. For that reason, Appellant's claim against the Operator does not satisfy element two of the state-created danger theory.[12] So we will affirm the dismissal of that claim.

## B.  *Monell* **Claim**

What of the City of Philadelphia's role in this tragedy? Appellant argues that the alleged calamity of errors that followed Alita Johnson's desperate call traces to the City's failure to provide "guidelines, policies, or training to its [fire department] operator[s] or dispatcher[s] regarding the communication of vital information to the caller requiring emergency assistance, or to the [f]irefighters responding to the

---

[12] Appellant did not allege that the Dispatcher intentionally declined to relay the decedents' location to the firefighters, either. (*See* App. at 56 (alleging that the Dispatcher "fail[ed] inexplicably to inform the [f]irefighters of the decedents' existence, location, or need of rescue").) When dismissing the claim against the Dispatcher, the District Court also concluded that, as alleged, the Dispatcher's behavior did not shock the conscience. For the reasons discussed above, that conclusion was sound, and is another basis for dismissing the claim against the Dispatcher. We decline to determine whether this claim satisfies elements one and three of the state-created danger theory.

16

scene." (App. at 59.) That failure, Appellant argues, violates the Johnson Family's constitutional rights.

We begin by noting what is not argued: that Philadelphia is always responsible for the conduct of its employees. Rather, as is well established, a municipality is not liable for the unconstitutional acts of its employees just because of their employment, under a *respondeat superior* theory. *Monell*, 436 U.S. at 691. But it may be liable if a plaintiff "demonstrate[s] that the violation of rights was caused by the municipality's policy or custom." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014). If the alleged policy or custom at issue is a failure to train or supervise (as it is here), the plaintiff must show that this failure "amounts to 'deliberate indifference' to the rights of persons with whom [the municipality's] employees will come into contact." *Id.* (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). "Ordinarily," this requires a plaintiff to identify a "'pattern of similar constitutional violations by untrained employees'" that "puts municipal decisionmakers on notice that a new program is necessary . . . ." *Id.* at 223 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Otherwise, the plaintiff needs to show that failure to provide the identified training would "likely . . . result in the violation of constitutional rights"—i.e., to show that "the need for more or different training [was] so obvious." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Appellant does not allege a history of similar problems at the fire department. Nor is it obvious that fire department personnel would *intentionally* withhold important information from the firefighters. Accidents occur, of course. But the *Monell* inquiry asks whether a municipality was deliberately

17

indifferent to the risk of a *constitutional violation*. *See Thomas*, 749 F.3d at 222 ("[L]iability under section 1983 requires a showing that the failure [to train] amounts to 'deliberate indifference' *to the rights* of persons with whom [the municipality's] employees will come into contact." (emphasis added) (quoting *Carter*, 181 F.3d at 357)). And as already noted, negligent behavior does not violate the Constitution under the state-created danger theory. That is why we see no error in the District Court's conclusion that Appellant has not plausibly alleged that the City was deliberately indifferent to anyone's substantive due process rights. We will therefore affirm the dismissal of her *Monell* claim.[13]

[13] The District Court believed that Appellant's inability to state a claim against an individual City employee meant that she could not state a *Monell* claim against the City. In *Fagan v. City of Vineland*, we held that "an underlying constitutional tort can still exist even if no individual [employee] violated the Constitution." 22 F.3d 1283, 1292 (3d Cir. 1994). But we later "carefully confined *Fagan* to its facts: a substantive due process claim resulting from a police pursuit." *Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 124 n.5 (3d Cir. 2003); *see also Vargas v. City of Phila.*, 783 F.3d 962, 974–75 (3d Cir. 2015) ("Because the officers did not violate any of her constitutional rights, . . . there was no violation for which the City of Philadelphia could be held responsible."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) (holding that *Monell* does not "authorize[] the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm"). At least two of our post-*Grazier* opinions have continued to assert that a

18

**C.      Negligence Claims**

Finally, Appellant alleges that the City simply ignored the history of problems at the Johnson Family's residence, by failing to fix the building's fire hazards and failing to stop the building owners' practices. The District Court held that the City was immune from these negligence claims because it had insufficient control over the building. Under the relevant Commonwealth law, we agree.

In Pennsylvania, municipalities are "generally . . . immune from tort liability." *Brewington ex rel. Brewington v. City of Phila.*, 199 A.3d 348, 350 (Pa. 2018); *see* 42 Pa. Cons. Stat. § 8541. But immunity does not extend to injuries caused by negligence in "[t]he care, custody or control of real property in the [municipality's] possession[.]" 42 Pa. Cons. Stat. § 8542(b)(3). This real-property exception is "narrowly construed," *Brewington*, 199 A.3d at 356, with liability arising only when the agency has "total control over the premises," *Sweeney v. Merrymead Farm, Inc.*, 799 A.2d 972, 977 (Pa.

---

municipality may be "independently liable for a substantive due process violation" even if no municipal employee is liable. *See Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006) (per curiam); *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003). But both opinions note that, for *Monell* liability to attach, "there must still be a violation of the plaintiff's constitutional rights." *Sanford*, 456 F.3d at 314; *Brown*, 318 F.3d at 482. As Appellant's *Monell* claim fails in any event, we need not wade into this discussion. *See Brown*, 318 F.3d at 475 n.1 ("We may affirm the District Court on any basis which has support in the record.").

19

Commw. Ct. 2002); *see id.* ("[L]imited control or mere occupation for a limited period of time is insufficient to impose liability.").

Appellant argues that the City, by exercising its regulatory power, "essentially divested the building owners of their legal possession of the property and assumed responsibility for its legal control and occupancy." (Reply Br. at 20 (emphasis omitted).) But she pleads no facts supporting this theory. She does not allege, for example, that the City physically occupied the building or let others do so. Her complaint, in fact, suggests the opposite. (*See* App. at 65 (alleging that the City "*failed to prevent*" the owners from re-occupying the building (emphasis added)).)

Because Appellant has not plausibly alleged that the City had "total control" over the decedents' building, she cannot rely on the real-property exception to overcome the City's immunity. We will therefore affirm the dismissal of her negligence claims.

### III. CONCLUSION

The deaths of Alita Johnson, Haashim Johnson, and Horace McCouellem should give all pause. Three lives were lost inside a building long-known to flout safety requirements, amid a bungled rescue effort. One hopes their deaths focus the will and resolve of those able to act. But the City and its employees may be held liable under the state-created danger theory, and under Pennsylvania tort law, only in narrowly defined circumstances. Because those circumstances are not met here, we will affirm the District Court's dismissal of Appellant's complaint.

*Tamika Johnson v. City of Philadelphia, et al.*, No. 19-2938

---

MATEY, *Circuit Judge*, concurring.

I write separately to join Judge Porter's view that our full Court should revisit the state-created danger doctrine. As our majority opinion states, the doctrine does not "stem from the text of the Constitution or any other positive law." Maj. Op. II.A.2. The doctrine "offers little help to public employees seeking to better discharge their duties," *id.*, but subjects them to lawsuits for alleged constitutional violations. As Judge Porter notes, the doctrine exemplifies a "troubling" expansion of substantive due process. *Kedra v. Schroeter*, 876 F.3d 424, 462 (3d Cir. 2017) (Fisher, J., concurring). Many state-created danger cases are tragic and unsettling and this matter is no exception. But the Due Process Clause of the Fourteenth Amendment "does not transform every tort committed by a state actor into a constitutional violation." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989). Because "[t]he place to make new legislation . . . lies in Congress," *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753 (2020), I join Judge Porter's call for our full Court to revisit the state-created danger doctrine.

1

PORTER, *Circuit Judge*, concurring.

I join the majority's opinion in full. But I write separately to explain my view that our full Court should revisit the state-created danger doctrine.

First, "it is troubling how far we have expanded substantive due process" in this area. *Kedra v. Schroeter*, 876 F.3d 424, 462 (3d Cir. 2017) (Fisher, J., concurring). As Judge Fisher noted in his concurrence in *Kedra*, we have gone much further than the Supreme Court by "fashioning" our own state-created danger doctrine and further still by "stating that there could be liability in non-custodial situations for gross negligence." *Id.* (citations omitted). As the majority opinion observes, the state-created danger doctrine "has not escaped criticism, since it does not stem from the text of the Constitution or any other positive law." Maj. Op. at 11. I agree that, "[g]iven that our substantive due process doctrine has gradually lowered the bar for bringing a [state-created danger] claim, it may be time for this full Court to reexamine the doctrine." *Kedra*, 876 F.3d at 462 (Fisher, J., concurring).

Assuming the continuing viability of the state-created danger doctrine in our Circuit, the full Court should nevertheless revisit our test for analyzing whether a state actor's behavior "shocks the conscience." In *Kedra*, Judge Krause skillfully synthesized our precedent into a three-part framework. First, "[i]n hyperpressurized environments requiring a snap judgment, an official must actually intend to cause harm in order to be liable." *Id.* (quoting *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015)) (internal quotation marks omitted).

Second, "[i]n situations in which the state actor is required to act in a matter of hours or minutes, we require that the state actor disregard a *great* risk of serious harm." *Id.* (emphasis added) (quoting *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006) (per curiam)) (internal quotation marks omitted). And third, when "the [state] actor has time to make an unhurried judgment, a plaintiff need only allege facts supporting an inference that the official acted with a mental state of deliberate indifference." *Id.* (quoting *Sanford*, 456 F.3d at 309) (internal quotation marks omitted). We have described

"deliberate indifference" as a "conscious disregard of a *substantial* risk of serious harm," *id.* (emphasis added) (quoting *Vargas*, 783 F.3d at 973–74) (internal quotation marks omitted), and also as "a willingness to ignore a *foreseeable* danger or risk." *Id.* (emphasis added) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997)) (internal quotation marks omitted).

Our precedent asks district courts to differentiate among the three tiers of culpability and apply them to a set of facts.[1] That is no simple task. But it is further complicated by the mystifying differences we have drawn between the second and third tiers of culpability. In my view, there is no practical difference between a "disregard of a *great* risk of serious harm" (the second tier) and a "conscious disregard of a *substantial* risk of serious harm" (the third tier). *Compare Great*, The Concise Oxford Dictionary https://www.oed.com/view/Entry/81104 (last visited September 1, 2020) ("Of considerable importance, significance, or distinction; important, weighty; distinguished, prominent; famous, renowned; impressive."), *with Substantial*, The Concise Oxford Dictionary https://www.oed.com/view/Entry/193050 (last visited September 1, 2020) ("[O]f real significance, weighty; reliable; important, worthwhile."). But a "great" or "substantial" risk is obviously weightier than a merely "foreseeable" risk— regardless of whether that "foreseeable" risk is willfully ignored. Our explication of the second and third tiers is inconsistent and nearly incoherent. That is not surprising, however, because "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

Assuming we continue to recognize the state-created danger doctrine at all, I suggest combining the second and third tiers into one and making the inquiry more straightforward: For

---

[1] When discerning whether deliberately indifferent conduct shocks the conscience, the Supreme Court has said that the question is fact dependent because "deliberate indifference that shocks in one environment may not be so patently egregious in another." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998).

a state actor to be liable in a "hyperpressurized environment requiring a snap judgment," he must actually intend to cause harm. But in any other context, the state actor must act with deliberate indifference that shocks the conscience. This articulation of the standard hews more closely to Supreme Court precedent,[2] is more consistent with the tests established by our sister circuits that have adopted the state-created danger doctrine,[3] and does not ask state actors like the operator and dispatcher in this case to ponder the gradations among a "substantial risk," a "great risk," and a "foreseeable danger" before reacting to an urgent 911 call.

I respectfully offer these brief observations about our state-created danger doctrine and hope that in an appropriate case we will revisit the doctrine as a full Court.

---

[2] *See Lewis*, 523 U.S. at 836, 847 n.8 (holding that liability will attach when a state actor's conduct is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience").

[3] *See, e.g.*, *Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932–33 (6th Cir. 2020); *Estate of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019); *Okin v. Vill. of Cornwall-on-Hudson Police Dep't.*, 577 F.3d 415, 431–32 (2d Cir. 2009).